UNITED STATES of America,
Plaintiff-Appellee,

v.

Frank RAGANO, Defendant-Appellant.

No. 74–2376.

United States Court of Appeals,
Fifth Circuit.

Oct. 14, 1975.

Rehearing and Rehearing En Banc
Denied Jan. 20, 1976.

E. David Rosen, Miami, Fla., Michael L. Kinney, Thomas T. Steele, Tampa, Fla., for defendant-appellant.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Claude Tison, Jr., Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before WISDOM, SIMPSON and RONEY, Circuit Judges.

SIMPSON, Circuit Judge:

This appeal requires us to review for the second time the conviction upon income tax related charges of Frank Ragano, a Florida attorney. See *United States v. Ragano,* 5 Cir. 1973, 476 F.2d 410. A description of the prior proceedings before the district court and on appeal is essential to an understanding of the issues raised by the present appeal.

The appellant was charged in a three count indictment returned July 14, 1971, with tax evasion and false swearing. Count 1 charged him with tax evasion in his 1967 tax return in failing to report taxable income of $180,022.20, in violation of Title 26, U.S.C., Section 7201.[1] Count 2 charged appellant with knowingly making a false declaration of income, under penalty of perjury, in his 1967 tax return, in that he knowingly received substantial income in excess of that reported, in violation of Title 26, U.S.C., Section 7206(1).[2] Count 3, related to Ragano's tax return for the calendar year 1968 and charged that he knowingly made a false declaration that he had sold for $230,022.20 certain shares of stock in Two Seasons, Inc., obtained by him in consideration for a $50,000 promissory note, and in the resulting claim that the income of $180,022.20 was properly treatable as long term capital gain, in violation of Title 26, U.S.C., Section 7206(1). At the trial on these counts the government contended that the receipt by appellant in 1967 of certain shares of stock should have been reported as taxable ordinary income in that year. The appellant maintained that he had purchased the shares in 1967 when he executed the promissory note and that the retransfer of the shares to the original seller was a legitimate capital gain transaction. The jury returned a verdict of not guilty as to Counts 1 and 2 and guilty under Count 3. Appellant appealed his conviction and sentence under Count 3 and this court reversed and remanded. *United States v. Ragano,* supra.

---

1. § 7201. Attempt to evade or defeat tax

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,-000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

2. § 7206. Fraud and false statements

Any person who—

(1) Declaration under penalties of perjury. —Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; or . . . .

In the prior appeal the reversal rested on two evidentiary matters. First, we held that the trial court erred in allowing a tax expert for the prosecution to testify that receipt of the shares of stock by appellant was payment for services. We held additionally that appellant's Sixth Amendment right of confrontation was infringed by the admission into evidence over objection of testimony that S. A. Rizzo, from whom the stock was obtained, had testified in an unrelated proceeding, to the effect that the stock had been given to Ragano for services rendered. *United States v. Ragano,* supra, 476 F.2d at 415.

Prior to the scheduled date of retrial on the original Count 3, a superseding six count indictment was returned against appellant. Count 1 charged appellant and Rizzo[3] under Title 18, U.S.C. § 371, with conspiracy to defraud the United States in the collection of revenue, by agreeing to disguise the payment of a "finder's fee" to appellant as a stock transaction on which he would claim a long term capital gain. Counts 2 and 3 charged appellant with tax evasion and false swearing in his tax return for the calendar year 1966 for failure to report $29,556.22 of income, in violation of Sections 7201 and 7206(1). Counts 4 and 5 charged Ragano with tax evasion and false swearing in his tax return for the calendar year 1968 by failing to report income of $33,645.44, in violation of Sections 7201 and 7206(1). Count 6 charged Rizzo with a 7206(1) offense, respecting his 1969 return's treatment of the Two Seasons stock delivered to Ragano. Count 6 was severed prior to trial and later dismissed. Note 3, supra. Appellant moved to dismiss the indictment on grounds of former jeopardy and collateral estoppel.[4] The district court denied appellant's motion, finding that the offenses charged in the superseding indictment were not identical to those in Counts 1 and 2 of the original indictment, and that no issue of fact as to any count of the superseding indictment could be said to have been resolved in appellant's favor at the first trial. A jury found appellant guilty of all five counts, and he was sentenced to five years imprisonment on each of Counts 1, 2, and 4, and to three years imprisonment on each of Counts 3 and 5. All sentences were directed to be served concurrently, execution of the sentences was suspended, and appellant was placed on three years probation.[5]

## THE UNDERLYING FACTS

The facts involve a complicated series of transactions. We delineate them in the view most favorable to the government. *Glasser v. United States,* 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704. In 1964 or 1965 Salvatore A. Rizzo, also known as Sam Rizzo, approached Ragano to seek his assistance in obtaining a five million dollar loan from the Southeast and Southwest Areas Pension Fund of the International Brotherhood of Teamsters (Pension Fund). Appellant agreed to assist Rizzo, and traveled to Chicago on several occasions to discuss the proposal with trustees of the Pension Fund. He did not, however, formally represent Rizzo at the Pension Fund meetings at which the loan was discussed. For his assistance in obtaining loans of this type, appellant would in common practice be entitled to a "finder's fee" of 5% of the loan proceeds from the recipient of the loan.[6]

---

**3.** Rizzo's motion to sever the charges against him was granted prior to trial. Subsequently, Rizzo's motion to dismiss the indictment as to him was granted, for reasons unrelated to this appeal.

**4.** Appellant first moved for dismissal of Count 5 on the ground that he was denied a speedy trial. Subsequently, he enlarged his collateral estoppel contention to include Count 5.

**5.** The government stipulated prior to trial that the second trial would constitute a retrial for sentencing purposes within the meaning of *North Carolina v. Pearce,* 1969, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656. Thus, if convicted appellant would not be sentenced to a term more severe than had been imposed under Count 3 of the original indictment.

**6.** In sworn testimony before a Florida legislative committee appellant testified that a "find-

The Rizzo loan application was submitted to the Pension Fund on February 9, 1965, and approved on March 3. On January 29 of that year articles of incorporation were approved for Two Seasons, Inc., a Florida corporation, organized for the purpose of acquiring and developing real estate. On the same date that the loan application was submitted to the Pension Fund the first meeting of Two Seasons was held. Rizzo was elected chairman of the Board and President. All fifty shares of stock in the company were issued jointly to Rizzo and his wife.

Appellant received a check for $15,000 from Two Seasons on May 11, 1965, which was charged on the company's books to the "Acquisition Costs" account. A second payment of $10,000 on September 22, 1965 to appellant was charged as a legal expense on the company's books. From November 15, 1965 through 1967 appellant received amounts ranging up to $30,000 from Two Seasons which were recorded on the company's books as loans. These loans, however, were neither secured by promissory notes nor was interest provided for or paid on them. By the end of 1967 these loans under the government's calculations totaled approximately $90,550, of which $30,000 was transferred during the year on the company's books to the "Legal Expense and Land Acquisition Costs" account, leaving a loan balance of $60,-550.

During this same period of time Ragano began borrowing funds from two banks. In November 1966 and March 1967 he borrowed $25,000 and $30,000, respectively, from the County National Bank of North Miami Beach. At the beginning of 1965 Ragano owed a balance of $16,500 to the Central Bank of Tampa on an existing loan. Between February 1965 and October 1967, eight additional loans were obtained by him from that bank in amounts ranging between $2,500 and $12,500. Although, in-

terest was paid through September 1967, no principal payments were made on any of these loans after September 1967, except for payments on an installment loan and three payments totaling $1,755.45 on two others. The outstanding balance on these loans as of September 1967 was $43,000. During that same month an employee of Two Seasons, Sheldon Kay, was requested by Rizzo to obtain a $10,-000 loan from the County National Bank, which Rizzo would guarantee, the proceeds to be paid to appellant.

On January 3, 1967, Rizzo transferred 20 shares (40%) of Two Seasons stock to Ragano in exchange for appellant's execution of an unsecured, non-interest bearing, demand note in the amount of $50,000. No principal or interest payments were made on this note prior to its cancellation by Rizzo in 1968. At the second trial the government introduced expert testimony showing that the fair market value of the shares on the date of transfer to appellant was $400,000 to $600,000.[7] On the same day that this transaction occurred, appellant was elected vice president of the company and named to the three member board of directors.

The certificate representing the twenty shares held by appellant was retransferred to Rizzo on March 24, 1967, and on November 6, 1967 two certificates of ten shares each were issued to appellant. In March 1967, but as of January 3, 1967, appellant in connection with a loan application filed with the County National Bank listed his assets to include the twenty shares of Two Seasons stock valued at $2,288,000. However, neither the $50,000 demand note held by the Rizzos nor any of the loans on the Two Seasons books were listed among his liabilities.

In December 1967, appellant delivered ten shares of the Two Seasons stock to the County National Bank as security for his outstanding loans. The bank was

---

er's fee" of 5 to 10% was normal for the services of an individual for obtaining loans of this kind. On at least two other occasions appellant received similar fees.

7. Appellant in a loan application listing his assets and liabilities as of January 3, 1967 valued the 20 shares at $2,288,000.

instructed by appellant to deliver the stock certificate to the person designated at the time the loans were repaid. On approximately January 2, 1968, appellant went to the County National Bank and introduced Louis Galliano to the bank officers. Mr. Galliano procured a loan from the bank nominally in the name of Assured Home Improvement Co., which was secured by the same ten shares of stock which the bank already held as security for the loans of appellant. The $30,000 proceeds of this loan were delivered to appellant who used $10,000 of this amount to retire the loan taken out by Sheldon Kay the previous September. At the conclusion of this transaction Frank Ragano had received payments of approximately $250,000, 5% of $5,000,000, from Two Seasons and the various bank loans.

Appellant and Rizzo on January 2, 1968, executed a shareholders' agreement providing that if either stockholder pledged his stock as security for indebtedness and that indebtedness came into default, the remaining stockholder would have the right to pay the obligations, to redeem the stock pledged, and assume full ownership of it. By a handwritten codicil (so labeled) to this agreement dated January 12, 1968, the appellant assigned the 20 shares to Rizzo "in consideration for the said S. A. Rizzo assuming the present indebtedness of the undersigned to the Central National Bank of Tampa, Florida, and the County Bank of North Miami Beach, Florida, and also holding the undersigned harmless and no longer indebted to the said corporation [Two Seasons] for loans made by the said corporation to the undersigned." The codicil did not mention the January 1967 promissory note given by Ragano to the Rizzos, although it was apparently canceled by this transfer.

Subsequently, on April 18, 1968, Rizzo paid the $68,000 balance on all of the County National Bank loan accounts and received the ten shares appellant had pledged as security. The certificate for the other ten shares remained in appellant's possession until mid-August 1968, when he delivered it to the Central Bank of Tampa, with instructions to deliver it to the person paying off his loan balances at that bank. On August 20, 1968, Rizzo sent an employee of Two Seasons to that bank with a check in the amount of $51,108.12 to pay the full balance on appellant's nine accounts and to take possession of the stock certificate. Subsequently, the two ten-share stock certificates were canceled and a replacement certificate was issued to Rizzo. In September 1968 Rizzo caused the loan balances on the books of Two Seasons in appellant's name to be transferred as loan receivables from him.

## DOUBLE JEOPARDY

On this appeal Ragano bases his primary challenge to his conviction upon the protections of the double jeopardy clause of the Fifth Amendment to the Constitution.

First, he contends that by appealing his conviction for false swearing in his 1968 tax return (Count 3 of the original indictment and Count 5 of the subsequent indictment) he consented to be retried only under the particular theory and factual characterizations urged by the the government at the first trial. The record of the first trial indicates that the government prosecuted appellant on the theory that although the sale of the stock to Rizzo in 1968 was a valid long term capital gain transaction, the original receipt of the stock by appellant was income in that it was transferred to him in lieu of a "finder's fee". Therefore, it should have been reported by him as income in his 1967 tax return. Prior to the retrial on Count 3, of the original indictment, the government in re-evaluating the evidence [8] in light of

---

8. The government concedes on this appeal that the theory on which it based the subsequent indictment was considered and rejected by the government prosecutors *prior to the original indictment.*

the jury's verdict and the trial judge's [9] comments at the first trial decided to seek a subsequent indictment, based on a different theory than urged by the government at the first trial. Thus, at the retrial the government attorneys characterized the stock transaction as a sham used to disguise the payment to appellant of a "finder's fee" in the form of loans, and that those loans were income to the appellant and on which income taxes were due and owing. Appellant contends that this shift on the part of the government in its presentation of its case was improper, and precluded by the double jeopardy clause, both as to the retrial on the original Count 3 conviction and on the additional counts alleged in the subsequent indictment.

■ Appellant's argument as to the retrial on Count 3 of the original indictment (Count 5 of the subsequent indictment) entirely overlooks the right of the government to retry a defendant for the same offense after the reversal of a prior conviction. It is a hornbook principle that when a defendant by a successful appeal secures a reversal of a criminal conviction, a later retrial for the same offense does not twice put him in jeopardy. *United States v. Jorn,* 1971, 400 U.S. 470, 484, 91 S.Ct. 547, 27 L.Ed.2d 543; *United States v. Ewell,* 1966, 383 U.S. 116, 124–25, 86 S.Ct. 773, 778–79, 15 L.Ed.2d 627, 633; *United States v. Panzavecchia,* 5 Cir. 1971, 446 F.2d 1293, cert. denied 1971, 404 U.S. 966, 92 S.Ct. 343, 30 L.Ed.2d 286. The rationale for this rule has been stated by the Supreme Court as:

> Corresponding to the right of an accused to be given a fair trial is the societal interest in punishing one whose guilt is clear after he has obtained such a trial. It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction. From the standpoint of a defendant, it is at least doubtful that appellate courts would be as zealous as they now are in protecting against the effects of improprieties at the trial or pretrial stage if they knew that reversal of a conviction would put the accused irrevocably beyond the reach of further prosecution. In reality, therefore, the practice of retrial serves defendants' rights as well as society's interest.

*United States v. Tateo,* 1964, 377 U.S. 463, 466, 84 S.Ct. 1587, 1589, 12 L.Ed.2d 448, 451; See also *United States v. Ewell,* supra, 383 U.S. at 121, 86 S.Ct. at 777, 15 L.Ed.2d at 631.

■ Ragano insists nevertheless that the doctrine of collateral estoppel bars the government from adopting for purposes of retrial, following prior conviction, a different theory of the case than that relied upon at the original trial. *Ashe v. Swenson,* 1970, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469, is the asserted authority for this contention. The Supreme Court in *Ashe* held that the doctrine of collateral estoppel was intertwined with the constitutional guarantee against double jeopardy. That case denied the right to try Ashe for armed robbery of one of six participants in a poker game following his acquittal at an earlier trial for robbing another participant in the same game. The Supreme Court found that the only rationally conceivable issue before the jury in the ear-

---

**9.** The trial judge at the first trial in a conference with the attorneys noted that the jury might reject the government's characterization of the case, as well as the defendant's defense:

"The Court: But that [the value of the shares received by appellant] is for the jury to determine. Let me say this other thing too. The jury can conclude that he is going to get 5 percent fee on the loan, and that the stock was just a vehicle to try to get capital gain treatment with it because when he did sell it, it was worth far more than—whatever it was he got for it, if he really owned it.

I think that they can draw those inferences.

\* \* \* \* \* \*

The jury can infer from the fact that this fellow sold him stock for nothing, and the way they handled the certificate, that is just a charade, the stock was . . . ."

lier trial was whether the defendant had been one of the robbers, and the jury verdict in that trial showed that he had not. Thus, in the second trial the same issue was before a second jury with the identity of the victim the only change. The Court said the second trial was precluded by the not guilty verdict on the earlier charge, and that collateral estoppel prohibited the relitigation of facts previously determined in the defendant's favor. The Court stated that the doctrine of collateral estoppel was:

> simply that when an issue of *ultimate fact* has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.

*Id.* at 443, 90 S.Ct. at 1194, 25 L.Ed.2d at 475 (emphasis added).

■ The doctrine of collateral estoppel as delineated in *Ashe* thus deals with facts not theories. See *United States v. Kehoe,* 5 Cir. 1975, 516 F.2d 78, 84 at n. 8. *United States v. Smith,* 5 Cir. 1973, 470 F.2d 1299. Nonetheless the appellant stresses language in *Ashe* condemning the prosecution in that case for using the first trial as "a dry run for the second prosecution". *Id.* at 447, 90 S.Ct. at 1196, 25 L.Ed.2d at 477. We hold that *Ashe* has no applicability in the circumstances of this case to the retrial of the charges in Count 3 in the original indictment following the reversal of the prior conviction on that count. What and all that the decision in *Ashe* condemned was the government's retrial of ultimate facts which had previously been decided in a defendant's favor. That case decided nothing respecting the government's right to alter its theory of the evidence in a case at a retrial following reversal of a prior conviction for the same offense. So restricting the prosecution from proceeding upon a new legal theory at retrial would erode severely the goals served by permitting retrial of a criminal defendant after the reversal of a conviction. The argument fails.

■ The second theory Ragano advances as to double jeopardy is that the government was barred by the prior prosecution from indicting him in a subsequent indictment on charges *not contained in the original indictment.* Specifically, tax evasion and false swearing in his 1966 tax return (Counts 2 and 3), tax evasion in his 1968 tax return (Count 4), and conspiracy to defraud the government in the collection of revenue (Count 1). We need go no further than to consider this claim as it relates to the conspiracy count. The trial court imposed concurrent five year sentences under Counts 1, 2 and 4, and two concurrent three year sentences under Counts 3 and 5. Under the concurrent sentence doctrine if the conviction is sustained as to the conviction under Count 1 (one of the counts as to which concurrent sentences were imposed) it is unnecessary to determine the legality of the conviction under the remaining counts. *United States v. Stone,* 5 Cir. 1973, 472 F.2d 909; *United States v. Rector,* 5 Cir. 1973, 488 F.2d 1079; *United States v. Vigo,* 5 Cir. 1970, 435 F.2d 1347. Cf. *Benton v. Maryland,* 1969, 395 U.S. 784, 791, 89 S.Ct. 2056, 2061, 23 L.Ed.2d 707.

■■ Preliminary to a discussion of Count 1 we emphasize the Supreme Court's observation that "[c]onspiracy is not the commission of the crime which it contemplates, and neither violates nor 'arises under' the statute whose violation is its object." *Braverman v. United States,* 1942, 317 U.S. 49, 54, 63 S.Ct. 99, 102, 87 L.Ed. 23, 28. See also *Callanan v. United States,* 1961, 364 U.S. 587, 593, 81 S.Ct. 321, 325, 5 L.Ed.2d 312, 317. We have consistently held that the commission of a substantive offense and entering a conspiracy to commit that offense are separate and distinct, and that ordinarily a person may be convicted of and sentenced for both. *United States v. Marshall,* 5 Cir. 1975, 513 F.2d 274; *United States v. Jasso,* 5 Cir. 1971, 442 F.2d 1054, 1056, cert. denied 1971, 404 U.S. 845, 92 S.Ct. 146, 30 L.Ed.2d 81. Accord, *United States v. Jackson,* 10 Cir. 1973, 482 F.2d 1167, cert. denied 1974, 414 U.S. 1159, 94 S.Ct. 918, 39 L.Ed.2d 111.

In *Jasso*, supra, the defendant was reindicted and convicted after an appeal on which the government confessed error at the original trial. In addition to the three substantive marijuana smuggling counts contained in the original indictment, the new indictment charged Jasso and others with conspiring, in violation of Title 26, U.S.C. § 176(a), to smuggle, transport and conceal marijuana. We rejected Jasso's argument that the double jeopardy clause barred inclusion of the conspiracy count in the new indictment, stating: "[t]he government could have charged conspiracy at any time within the statutory limitation period without regard to any existing indictment for the marijuana offenses. An indictment for a new and different crime is clearly not double jeopardy". 442 F.2d at 1056. To like effect in *Marshall*, supra, a defendant was indicted for conspiracy to possess cocaine with intent to distribute and to cause distribution. The indictment alleged 27 overt acts, seven involving the defendant. Three of the seven had served as the basis for three substantive counts of an earlier indictment to which the defendant had entered guilty pleas. On appeal from conviction of the conspiracy charge the defendant urged that the conspiracy indictment, in light of his guilty plea to the earlier charges, infringed his double jeopardy rights, and precluded any effective defense on his behalf. We rejected each of these arguments noting that the substantive offenses and the conspiracy offense were separate charges requiring "distinct elements of proof".

Appellant, however, maintains that the "same transaction" definition of "same offense" in the double jeopardy clause, barred the government from indicting him on the conspiracy count since it was not contained in the original indictment. This argument stems from the view advanced by the concurring opinion in *Ashe* of Justice Brennan, joined by Justices Douglas and Marshall, that the double jeopardy clause requires the government to join in one trial all charges against a defendant that grow out of a single criminal act, occurrence, episode, or transaction. *Ashe*, supra, 397 U.S. at 453–54, 90 S.Ct. at 1199–1202, 25 L.Ed.2d at 481.

The government responds that the "same transaction" test, as proposed by Justice Brennan, has no application to retrials following the reversal of a prior conviction, since its sole purpose is to restrict the use of multiple trials on closely related charges when the government's interest could be vindicated in a single trial. Hence the government maintains that in the case of retrials after reversal of a prior conviction the government may indict on additional charges since the number of trials has been limited to the fewest possible.

■ We find it unnecessary to decide the applicability of the "same transaction" definition of "same offense" to this case. This circuit has previously declined to apply the "same transaction" definition on the ground that although entitled to some weight the views of only three Justices are not binding. *United States v. Marshall*, 5 Cir. 1975, 513 F.2d 274; *United States v. Smith*, 5 Cir. 1973, 470 F.2d 1299; *Wingate v. Wainwright*, 5 Cir. 1972, 464 F.2d 209. Accord *Brown v. Hendrick*, 3 Cir. 1970, 431 F.2d 436, 440, cert. denied 1971, 402 U.S. 976, 91 S.Ct. 1677, 29 L.Ed.2d 141; *Moton v. Swenson*, 8 Cir. 1973, 488 F.2d 1060; *United States v. Fusco*, 7 Cir. 1970, 427 F.2d 361.

## EVIDENTIARY RULINGS

Appellant next challenges his conviction on the grounds that the trial court erred in receiving in evidence certain corporate documents and tax returns, and in excluding from evidence the contents of a letter from the accountant of Two Seasons to the appellant's accountant. We deal first with the admissibility of the documents allowed in.

■ As part of the government's case it argued that appellant was never in fact a bona fide shareholder or officer of Two Seasons, and, therefore, the trans-

fer of the stock to him and its subsequent sale was merely an attempt to disguise the payment of his finder's fee. The government sought to show this proposition through certain corporate reports filed with various departments of the State of Florida, which purported to list all of the directors, officers, and, in one instance, the shareholders of Two Seasons during the period in which appellant purportedly owned the stock. In none of these documents does appellant's name appear in any capacity. The documents involved consist of: (i) an annual corporate report, filed in July 1967, (ii) a certificate of amendment to the articles of incorporation, filed in November 1967, and (iii) an application for a beverage license, filed in January 1968. These documents were offered by the prosecution as public records of the State of Florida, and appellant stipulated as to their genuineness, authenticity, and official character. However, when the government sought to have these documents entered into evidence, appellant objected on the ground that these were hearsay statements of Rizzo, as President of Two Seasons, regarding the status of appellant in the corporation and therefore inadmissible.[10] Further, appellant alleges that during the period when these documents were filed his relations with Rizzo were strained, and, therefore, Rizzo had a motive to falsify the documents.

In our judgment the documents in question satisfy the requirements of the Federal Business Records Act, Title 28, U.S.C., Section 1732(a), and thus qualify as an exception to the hearsay rule. Further, we hold that the admission of this documentary evidence was cumulative, and the error, if any, was harmless error, which did not prejudice appellant's rights. Rule 52(a), F.R.Crim.P.; *United States v. Quong*, 6 Cir. 1962, 303 F.2d 499.

In *Sabatino v. Curtiss National Bank*, 5 Cir. 1969, 415 F.2d 632, Judge Thornberry extensively analyzed the purpose and effect of the Business Records Act, setting forth a three-pronged test for determining the admissibility of business records:

(1) the records must be kept pursuant to some routine *procedure* designed to assure their accuracy,

(2) they must be created for *motives* that would tend to assure accuracy (preparation for litigation, for example, is not such a motive), and

(3) they must not themselves be mere cumulations of hearsay or uniformed opinion.

415 F.2d at 637 (emphasis in original). We find that all of the documents in dispute in this case satisfy these guidelines. The *Sabatino* requirement that the documents be prepared for "motives" to assure accuracy is fulfilled by the fact that each was required by the state to be filed as a condition of corporate existence, and the loss of corporate privileges could result from a failure to file or by filing intentionally false documents. Florida Stat. §§ 608.04, 608.041, 608.351. The failure by the government to lay a foundation, in the form of testimony by an employee of Two Seasons as to the procedure used in preparing and filing these documents does not affect their

---

10. In *Ragano I*, supra, we held that the trial court erred in admitting into evidence the testimony of an IRS agent relating to an alleged admission by appellant regarding Rizzo's testimony before a state legislative committee. Rizzo had testified that appellant had earned the stock as a finder's fee and attorney's fee, and had not actually purchased the stock. When the IRS agent questioned appellant as to the truthfulness of this statement, appellant admitted that he was aware of it but stated that its substance was untrue. At trial the agent's testimony relating to this exchange was admitted over objection as an admission by appellant. This court held that the receipt of the agent's testimony relating to Rizzo's testimony was hearsay, and, in light of appellant's clear denial of the truth of that testimony, appellant's Sixth Amendment right of confrontation had been denied. *United States v. Ragano*, 476 F.2d at 414–16. On the present appeal, Ragano maintains that the testimony of Rizzo is being indirectly admitted through the corporate documents here involved.

admissibility, in light of the stipulation as to their authenticity and the fact that they were filed and prepared in the regular course of business. Cf. *Meister v. C. I. R.*, 3 Cir. 1974, 504 F.2d 505; *United States v. Henderson*, 8 Cir. 1971, 446 F.2d 960, 966–67; *Carroll v. United States*, 9 Cir. 1963, 326 F.2d 72. Appellant's testimony as to his strained relations with Rizzo affected only the weight to be accorded the documents, not their admissibility.[11] See *United States v. Re*, 2 Cir. 1964, 336 F.2d 306.

▬ Additionally, the records objected to were similar in form and tenor to a document designating a resident agent for Two Seasons, already in evidence without objection which failed to list Ragano as either officer or director. Finally, both an employee and an officer of Two Seasons testified that in the realm of their duties neither had any knowledge of appellant's having the authority of an officer or director of the corporation. We hold therefore that the documents were merely cumulative of other evidence before the jury. *United States v. Quong,* supra, 303 F.2d at 504.

▬ On similar grounds Ragano maintains that prejudicial error was committed by the admission into evidence of the corporate income tax returns of Two Seasons, for the periods ending in March 1967 and March 1968. At the first prosecution these tax returns were received in evidence, with no error being claimed in this respect on the prior appeal. However, this court saw fit "in the interest of trial economy", 476 F.2d at 418, to direct attention to *Greenbaum v. United States*, 9 Cir. 1935, 80 F.2d 113, 125, regarding the admissibility of tax returns. In *Greenbaum* the ·

Ninth Circuit held that income tax returns were hearsay when used against an individual other than the maker, unless some relationship between the tax return and the individual against whom they were sought to be used could be found. 80 F.2d at 125–26. Leaving to one side the questionable continuing vitality of *Greenbaum* as precedent, we note that in the present case the tax returns were admitted for the limited purpose of use by the government expert witness in arriving at the evaluation of Two Seasons stock. They were useful for this purpose because they contained detailed schedules of land sales made by the corporation. With other records and documents, also in evidence, these tax returns provided an accessible and convenient source of supporting data on which to arrive at a valuation of the Two Seasons shares. The trial court's admission of the corporate tax returns for this stated limited purpose was not error. This is underscored by Ragano's claim in his loan application to County National Bank that the twenty shares had a value of $2,288,000, as contrasted to government testimony fixing the value at $400,000 to $600,000. See Note 7, supra, and accompanying text. Clearly, this evidence did not prejudice Ragano's case.

Ragano also contends that the trial court erred in excluding from evidence a letter from the accountant for Two Seasons to Ralph Andretta, appellant's accountant, setting forth the former's interpretation of the tax consequences of the stock transactions. At trial the government called Andretta, and questioned him regarding the sources of information he employed in determining appellant's tax liabilities for the years in question.[12] In responding to this inquiry

---

11. The Business Records Act, Title 28 U.S.C. § 1732(a) provides in part:

. . . . .

All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

12. In passing we note Andretta's testimony, not questioned by Ragano, that in 1965 or 1966 appellant questioned Andretta as to the potential tax consequences of his receiving stock in Two Seasons in lieu of his finder's fee. Andretta responded that appellant would still be liable for income taxes on the fair market value of the stock. Appellant then inquired as to the tax ramifications of purchasing the

Andretta stated that he had relied on a yearly "recap of fees" which had been sent by Two Seasons' accountant, Nelson Whyte, to him. Appellant's counsel sought on cross-examination to question Andretta as to the extent of the reliance placed in Andretta and Whyte by Ragano in calculating his tax liabilities and treating the stock transaction as one producing long term capital gain. In this regard the trial judge permitted appellant's counsel to show Andretta the letter from Whyte, and to inquire as to whether he had relied on the contents of the letter in determining the manner in which to report the stock transaction. The trial judge refused however to permit the contents of the letter to be published through Andretta, since it embodied also the opinion of another accountant not a witness, hence not available for examination as to his rationale in reaching that opinion. Appellant's counsel thereupon stated that he did not at this time intend to publish the letter, and that he would be satisfied if Andretta was permitted to identify it and state

that he had relied on it.[13] This was permitted by the court. At the close of the evidence the trial judge called attention to the fact that appellant's counsel had failed to publish the letter, and had not called Whyte as his witness. Appellant's counsel declined at that time to call Whyte as a witness or to offer the letter for publication.[14]

 Ragano urges that the trial court erred in not permitting Andretta to testify regarding the contents of the Whyte letter. We disagree. Appellant's counsel was permitted on cross-examination of Andretta to use the letter to the full extent he requested. Subsequently he declined to call Whyte as a witness to be examined as to the letter in the face of the court's reminder of the state of record. Error is not demonstrated with respect to this incident.

## SUFFICIENCY OF THE EVIDENCE

Lastly we find without merit Ragano's final ground for appeal, that error was

---

stock, to which Andretta replied that any profit realized from the subsequent sale of the stock would be taxed at capital gains rates.

13. The following exchange occurred out of the presence of the jury:

THE COURT: . . . You can ask him [Andretta] if this is the letter he relied on.

MR. ROSEN [APPELLANT'S COUNSEL]: That is precisely what I wanted to do, Your Honor.

THE COURT: But don't go into the details.

MR. ROSEN: Well, I don't intend to publish it at this point, Your Honor, because I can't offer it out of turn.

THE COURT: Well, you can't offer it until it is in evidence—you can't publish it until it is in evidence.

MR. ROSEN: That's right.

THE COURT: All right. Thank you. That is the main reason you are not going to do it.

14. The following occurred at that time at side bar, out of the jury's hearing:

THE COURT: To save possible trouble later on—you may have overlooked it—I don't believe that letter from Mr. Whyte to Mr. Andretta was ever received in evidence.

MR. TISON [THE GOVERNMENT PROSECUTOR]: No, it wasn't.

MR. ROSEN: It wasn't.

MR. TISON: That's correct.

MR. ROSEN: I think my position is preserved on the Government's side of the case.

MR. TISON: Well, he could have brought the man who wrote it.

THE COURT: I just want—

MR. ROSEN: I am aware of it.

THE COURT: You had Mr. Whyte under subpoena.

MR. ROSEN: No, I didn't. The government did.

MR. TISON: We had him under subpoena.

THE COURT: Can you make him available?

MR. TISON: Certainly. I told Mr. Rosen—

THE COURT: He is available?

My ruling was that if Mr. Whyte was available I sustained the Government's objection to its introduction. And I did it on the ground that it should not be received because it does contain an opinion; and it apparently is an opinion which—well, at any rate, it contains an opinion. And where that witness is available he should be called, so that he could be cross-examined about that opinion.

And to put the letter in without that would, in effect, deny the Government the right to confront the witness; and it is hearsay.

MR. ROSEN: Well, I stated my position in the Government's case in chief. I do not propose to call Mr. Whyte.

committed by the trial court in the denial of his motion for a directed judgment of acquittal, first made when the government rested its case in chief and renewed when both sides announced closed. This contention ties back into the primary point discussed, *supra*, the asserted presence of double jeopardy as a result of the superseding indictment and of the shift in the government's theory of the case between trials. Indeed, it amounts when scrutinized to no more than a corollary to the same contention of "estoppel by argument".

It is urged that because the government's theory in *Ragano I* was that although the defendant acquired the Two Seasons stock in a valid transaction, he treated the tax consequences incorrectly, whereas at the second trial the government traveled on the new indictment on the different and inconsistent theory that the stock transactions were a sham masking the payment of a finder's fee, and hence that the government has placed itself in the position of urging at different times that the same underlying facts support inconsistent and irreconcilable interpretations. This, it is asserted, puts an end to any claim that guilt was established under assertedly accepted standards governing the proof required to establish guilt in circumstantial evidence cases. Reliance is placed upon Fifth Circuit cases, mostly pre-*Holland*,[15] stating that evidence sufficient to establish guilt in circumstantial evidence cases must not only be consistent with guilt, but inconsistent with innocence. The argument continues that if the evidence is equally consistent with diametrically different guilty theories, it must also be consistent with innocence, or at least is not inconsistent with innocence.

This argument fails in at least two particulars. First, the government's case is based to a slight extent only upon circumstantial evidence. *Inter alia*, the evidence at the second trial consisted of three separate sworn statements of Ragano that the stock transfers represented in some manner his 5% finder's fee for obtaining the $5,000,000 loan. Direct evidence, consisting of actual checks, wire transfers, and the like, traced the receipt of $250,000, 5% of $5,000,000 to Ragano. The sole aspect of the government's proof resting on circumstantial evidence was the proposition that it was money, paid in 1966 and 1968, rather than the stock certificate received in 1967, that constituted the actual fee.

 Second, assuming contrary to our post-*Holland* decisions[16] that the standard described is appropriate to this appeal, the hypothesis of the 1967 income is *not a hypothesis of innocence* as to this indictment. If credited, the hypothesis is one of guilt as to at least Count 5 of the superseding indictment. Under that theory the reporting of the stock transfers in the 1968 return is as completely false as under the view that the money was the finder's fee, though for different reasons. The hypothesis

---

15. *Holland v. United States*, 1954, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150. *Holland* held that it is "confusing and incorrect" to instruct the jury that a special rule applies to cases based upon circumstantial evidence, *ibid.* at 139–140, 75 S.Ct. at 137, 99 L.Ed. at 166, continuing: "Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more." *Ibid.* at 139–140, 75 S.Ct. at 137–138, 99 L.Ed. at 166–167.

16. Post-*Holland*, the standard for review adopted by this Circuit, to be applied irrespective of whether the evidence is direct or circumstantial, is whether "reasonable minds could conclude that the evidence is inconsistent with the hypothesis of the accused's innocence". *United States v. Warner*, 5 Cir. 1971, 441 F.2d 821, 825, cert. denied 1971, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58. See further e. g. *United States v. Black*, 5 Cir. 1974, 497 F.2d 1039, 1041; *United States v. Amato*, 5 Cir. 1974, 495 F.2d 545; *United States v. Edwards*, 5 Cir. 1974, 488 F.2d 1154; *United States v. Fontenot*, 5 Cir. 1973, 483 F.2d 315, 321.

may well also support the finding of guilt as to Count 1, although in view of the concurrent sentence doctrine we will not lengthen this opinion further by a detailed analysis.

Further, the argument advanced entirely ignores the difference in the government's proof at the two trials. At the second trial some forty additional documents and the testimony of two witnesses demonstrated that at all relevant times a 40% interest in Two Seasons, Inc. was so valuable that it would be unreasonable to suppose that Ragano received a bona fide ownership interest in the stock as payment of the balance due on his finder's fee. Ragano's knowledge of the value of the stock was separately proved by some of his earlier statements and other evidence. In January 1967, when the shares were issued to him, they had a minimum value of at least $400,000, nearly three times the remaining unpaid amount due on his fee. The evidence produced at trial was supportive of a single conclusion only: that the series of stock transfers was no more than a sham designed to create a vehicle to disguise the fee as a capital gain.

The judgment appealed from is Affirmed.