**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Joseph DUCKETT, a/k/a Feton Sutton,
Defendant-Appellant.**

**No. 76–2017.**

United States Court of Appeals,
Fifth Circuit.

April 14, 1977.

Rehearing Denied May 24, 1977.

Victor Sherman, Beverly Hills, Cal., Joel Hirschhorn, Miami, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., Barbara D. Schwartz, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before TUTTLE, CLARK and RONEY, Circuit Judges.

RONEY, Circuit Judge:

On the ground that there was insufficient evidence by which the jury could find guilt beyond a reasonable doubt, we reverse the conviction of Joseph Duckett for conspiring to import heroin from the Bahamas to the United States. Charged with both conspiracy to import, 21 U.S.C.A. § 963, and importation, 21 U.S.C.A. §§ 952(a), 960(a)(1) and 18 U.S.C.A. § 2, the defendant was found not guilty by the jury of the substantive charge of importation, but convicted of conspiracy. Reversal being required on the insufficiency of the evidence, it is not necessary to decide the other three issues argued on appeal: admission of irrelevant and prejudicial testimony; the failure of the trial

court to give an instruction on circumstantial evidence at the request of the defendant; and alleged misconduct of the Assistant U. S. Attorney at the trial.

To clearly illustrate the precise role which the defendant played in the events which form the basis of the charge against him, we will first set out the facts without any reference to his participation, and then separately detail his activities.

On August 25, 1975, Charles Gray, Barbara Gaston and Brad Colebrook entered Bahamas Airport. They were carrying several pieces of luggage, including one red suitcase. Colebrook, a former Bahamian customs official, summoned a porter, named DeMeritte, to take all of the group's luggage, except the red suitcase, to the check-in line. Gray and Gaston proceeded to check-in for Bahamas Air Flight 44 to Miami. Colebrook then resummoned the porter, who at his request took the red suitcase and put it on a trolley that was going out to Flight 44. For this service the porter was given the unusually high tip of $20. As a result of this maneuver the suitcase would have avoided inspection by U. S. Customs officials working in the Bahamas. The porter testified that he agreed to assist Colebrook in circumventing an inspection only because he knew that Colebrook was with Bahamian customs.

A short time later, another porter approached U. S. Customs Agent Boeman with the red suitcase. The porter had noticed that this bag lacked both the U. S. Customs stamp, and a baggage tag for Miami. Since the suitcase was locked the agent took it to a back room and opened it with a special set of keys. It contained 16 bags of white powder, later determined to be 13½ pounds of heroin. The agent resealed the suitcase, had it placed on Flight 44, and called Miami to notify agents there of his discovery and to request surveillance.

In response to this call, Customs Supervisor Arango in Miami arranged surveillance. After the flight landed, the red suitcase was picked up by Gray, and placed alongside several other black suitcases. Gray then found a porter, who took all the bags

but the red one and left the area with the porter to hail a taxi. Shortly thereafter Barbara Gaston came over to the red suitcase, picked it up and began to leave the area. At this point she was detained, taken to the customs office, the suitcase was opened, and she was placed under arrest. She identified herself to the officers at that time with an alias.

Gray was also apprehended as he attempted to locate a cab and taken to the customs office. When he emptied his pockets, an airport locker key was discovered. The locker contained a briefcase with passports for Gray and Gaston, and $10,000 cash.

Duckett's connection with this sequence of events was as follows: he was at the front door of the Bahamas Airport with Colebrook and two other persons, and shortly thereafter was standing next to Colebrook when DeMeritte was given $20 to take the red suitcase around the customs barrier. He then proceeded to a customs line different from the one to which Gray and Gaston had gone. While waiting in line he went over to Gray and Gaston, and asked them for a key, an incident which was seen by the agent who was inspecting Gray and Gaston. He then returned to his line to be inspected by Agent Boeman. When asked to produce proof of American citizenship, Duckett presented a birth certificate in the name of Feton Sutton, an alias. Boeman noticed, however, that there was also a U. S. passport in Duckett's hand luggage. Boeman examined this passport, which was in Duckett's own name. To explain the discrepancy, Duckett told Boeman that the passport and luggage belonged to a friend who had asked him to take these items to Miami.

Boeman then examined the contents of the suitcase which Duckett was carrying and discovered marijuana traces in the pockets of a white suit. Based on this discovery, the suitcases were thoroughly searched and Duckett himself was strip searched. Duckett was detained for some time during this procedure, but no further contraband was found, and Duckett was

permitted to depart. As he was leaving, he requested assurances that he would not be searched again upon landing in Miami. He was told that no such guarantee could be given. There is no further evidence as to Duckett's movements, and he was never seen disembarking from Flight 44 after it landed in Miami. When Ms. Gaston was being questioned, however, she produced a voter registration card bearing the name Feton Sutton, the alias used by Duckett in the Bahamas. She also had a wallet with personal papers belonging to Duckett and an address book with the initials J.D.

At trial, testimony was introduced that sometime prior to 1975 Duckett had been in Gray's house when heroin was present. Defendant objected to the admission of this testimony as prejudicial. No further testimony was elicited as to whether Duckett was aware of the presence of the heroin.

In evaluating the claim on appeal that the evidence was insufficient to support the guilty verdict, we must consider the evidence in the light most favorable to the Government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). To affirm, this Court need only find that reasonable minds could have found the evidence to be inconsistent with the hypothesis of the accused's innocence. *United States v. Ragano*, 520 F.2d 1191, 1203 n.16 (5th Cir. 1975), *cert. denied*, 427 U.S. 905, 96 S.Ct. 3192, 49 L.Ed.2d 1199 (1976). In the conspiracy context, "the proof may be circumstantial or direct or both, but it must convince beyond a reasonable doubt that a conspiracy existed, that the defendant knew it, and with that knowledge intentionally did some act or thing to further or carry on that conspiracy." *Causey v. United States*, 352 F.2d 203, 207 (5th Cir. 1965).

On the facts before this Court we must conclude that a reasonable juror could not have been able to reasonably exclude the hypothesis of the accused's innocence. Although Duckett was present with the conspirators at the airport, it is well settled that mere presence is insufficient, without more, to sustain a conviction for conspiracy. *United States v. Di Re*, 332 U.S. 581, 593, 68 S.Ct. 222, 92 L.Ed. 210 (1948). There is no evidence that Duckett ever touched the red suitcase, much less that he was aware of its contents. The joint presence of the defendant and the conspirators at the airport and the preexisting relationship between the parties is insufficient alone to prove beyond a reasonable doubt that defendant had a part in the conspiracy. *Cf. United States v. Duke*, 423 F.2d 387 (5th Cir. 1970). Thus the fact that Duckett approached Gray and Gaston for a key, and that Gaston possessed papers with both Duckett's true name and alias do not provide a legitimate basis for inferring his participation in a conspiracy to import heroin. *Cf. United States v. Cantu*, 504 F.2d 387 (5th Cir. 1974).

The fact that Duckett was using an alias is suspicious, but it is, without more, equally consistent with a variety of explanations. The subsequent discovery of marijuana in his suitcase suggests one such alternative explanation. Of course the possession of marijuana traces does not inculpate Duckett in the heroin smuggling activities of Gray, Gaston and Colebrook. Similarly, Duckett's request that he be given assurances he would not be searched in Miami may have been due either to a concern that the authorities there would have found marijuana traces a sufficient basis for arrest, or to a desire on his part to avoid the undoubtedly unpleasant experience of a full customs strip search for the second time that day. The fact that he was not seen arriving in Miami is as consistent with the theory that Duckett wished to avoid another strip search as it is with any participation in the conspiracy. Finally, the testimony that he had been in Gray's home when heroin was present can only be considered as showing a longstanding acquaintanceship with Gray, since there was no testimony that Duckett had seen or been aware of the heroin at the time.

From this review of the evidence concerning Duckett's activities on the day in question, it is clear that the jurors should have entertained a reasonable doubt about his guilt. While his course of conduct is odd, and perhaps difficult to explain, the

links between Duckett and the conspiracy are so tenuous that, making all "reasonable inferences and credibility choices as will support" the guilty verdict, *United States v. Wayman,* 510 F.2d 1020, 1026 (5th Cir.), *cert. denied,* 423 U.S. 846, 96 S.Ct. 84, 46 L.Ed.2d 67 (1975), we conclude that no reasonable mind could find guilt beyond a reasonable doubt.

■ The prosecutor argues that only "slight evidence" is required to connect a particular defendant with a conspiracy which has been clearly demonstrated to exist. *See United States v. Prout,* 526 F.2d 380, 385 (5th Cir. 1976). Cited as a shibboleth permitting rapid disposition of challenges to the evidence in conspiracy cases, this rule has been articulated frequently. The roots of the rule show that its current version is an unfortunately abbreviated recapitulation of a sound doctrine. Set out more thoroughly, it stands for the proposition that

> [o]nce there is satisfactory proof that a conspiracy has been formed, the question of a particular defendant's connection with it may be merely a matter of whether the stick fits so naturally into position in the fagot as to convince that it is part of it. It is therefore possible for the circumstances on an individual defendant's participation in an established conspiracy to become substantial from their weight in position and context, though in abstraction they may seem only slight.

*Phelps v. United States,* 160 F.2d 858, 867–868 (8th Cir. 1947), *cert. denied,* 334 U.S. 860, 68 S.Ct. 1525, 92 L.Ed. 1780 (1948). There is no evidence in this case from which to determine the part Duckett was supposed to have played in the conspiracy. Where, as here, the facts, even though in context, are still too weak to support the necessary inferences beyond a reasonable doubt, the conviction cannot stand. We have previously pointed out that "[o]ur adherence to the 'slight evidence' rule should make us nonetheless insistent that guilt remain 'individual and personal' and that the government show beyond a reasonable doubt that each and every alleged member

of the conspiracy had the deliberate, knowing, specific intent to join the conspiracy." *United States v. Morado,* 454 F.2d 167, 175 (5th Cir.), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972).

REVERSED.

CLARK, Circuit Judge, dissenting:

I respectfully dissent. To demonstrate the basis for my disagreement, it is necessary to narrate the evidence as a whole, though this involves some repetition of Judge Roney's statement. Mine, as his, is of course made viewing the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). On August 25, 1975, Patty DeMeritte, a porter at the Bahamas Airport, met Brad Colebrook and three other persons who were eventually identified as Joe Duckett, Barbara Gaston, and Charles Gray, as they arrived together at the front door of the Bahamas Airport. Although DeMeritte had known Colebrook for a long time from his position with the Bahama Customs, a position which he still held at that time, DeMeritte had never before seen the other three. The group had four pieces of luggage, three black and one red, and a handbag. Two pieces of luggage were "big, soft on rollers, and two of them—one of them was hard and the other soft. They had two rollers." DeMeritte took two pieces of large black luggage on rollers and placed them at the Bahamasair International Counter 16 where the luggage would first clear domestic and then go through United States Customs onto Bahamasair International Flight 44 to Miami. By the time DeMeritte had done this and returned, Gaston and Gray had left Colebrook and Duckett, and they were checking in at Bahamasair Counter 16.

Colebrook, with Duckett still standing beside him, then asked DeMeritte to take a red suitcase that was on rollers around customs and place it on the trolley which held luggage for Bahamasair International Flight 44 to Miami. DeMeritte did as Colebrook requested. DeMeritte testified that he had never been asked to take luggage

around customs before and that Colebrook gave him a $20 tip for doing so. Between the time when DeMeritte took the red suitcase around customs and Duckett, Gaston, and Gray were next seen, Duckett checked in at the Bahamasair ticket counter. Colebrook was not heard of or seen again.

The next Bahamas Airport employee witness to have any contact with this group was Bern T. Kenney, a United States Immigrations Officer whose responsibilities include pre-clearance of people and their luggage flying from the Bahamas into the United States. On August 25, 1975, Kenney and Robert Boeman, a United States Customs Inspector whose responsibilities were identical to Kenney's, were clearing two separate lines of people flying to Miami on Bahamasair International Flight 44, the lines being positioned about 10 feet apart. Gaston and Gray were standing in Kenney's pre-clearance line. Duckett was standing in Boeman's pre-clearance line. As Gaston and Gray moved up in their line to Kenney's station, Duckett left the place in Boeman's line, walked over to Gaston and Gray "to get a key, or something from them," and then returned to his position in his own line.

Thirty minutes later, Duckett was undergoing pre-clearance at Boeman's station. Duckett identified himself to Boeman as Felton Sutton and presented for Boeman's inspection one of the black suitcases and the handbag brought to the terminal by Colebrook, Duckett, Gaston, and Gray. After accepting Duckett's written customs declaration, which was in the name of Feton Sutton, Boeman asked Duckett for proof of his United States citizenship. While Duckett was searching through his pockets for some type of identification, Boeman saw a United States passport in the handbag, which was lying partially open on the pre-clearance table. Boeman took the passport and told Duckett, "This is all you need." At that moment, Duckett produced a birth certificate in response to Boeman's initial request for identification. The passport was that of Joe Duckett, III. The birth certificate was in the name of Feton Sutton.

In response to Boeman's questions about whose passport and luggage he was carrying, Duckett told Boeman that the passport, the luggage, and its contents belonged to a friend of his. Duckett said that he and a friend had shared a hotel room in Nassau the night before. Earlier that morning, Duckett was not sure when, his friend had departed the hotel for an undisclosed destination and had asked Duckett to carry his personal effects with him to Miami as his friend was returning to Miami that same day.

Boeman thereupon commenced a search of the black suitcase. A close examination of the inner breast pocket of a white suit revealed a small residue of a grass-like substance which was field tested and proved to be marijuana. Because of the positive results of the field test, Duckett was required to undergo a strip search. This was conducted by a Bahamiam police officer with Boeman present and observing. The search produced nothing. Duckett was again questioned as to the whereabouts of the owner of the suitcase. In response to Duckett's answers that the owner might have gone to Freeport, or on to Miami, the passenger lists of ticket stubs were checked to see if anyone by the name of Joe Duckett had flown from the Bahamas Airport that morning. No such name was found.

Before leaving, Duckett asked Boeman if he could give him a signed statement to present to Miami Customs that Duckett had been cleared by Nassau Customs to avoid being checked again in Miami. Boeman told him that it was not possible to do that. Duckett was then released to go into the departure lounge but was not seen or heard from again.

As Boeman was returning to his pre-clearance station, a Bahamas Air Porter came off the ramp with a red suitcase marked "Blue Light" on the handle and presented it to Boeman for customs inspection. The porter knew the red suitcase had not cleared customs because it did not have a pre-clearance stamp, which all properly

customs-inspected luggage receives. Boeman opened the red suitcase which was the same one Colebrook had asked DeMeritte to carry around customs. It contained what proved to be 13½ pounds of southeastern Asia heroin. Boeman put everything back into the red suitcase, relocked it, placed it onto the Bahamasair baggage cart for Flight 44 to Miami. Boeman's customs supervisor then telephoned the U.S. Customs Office in Miami, notifying the Miami Customs Supervisor Arango what Boeman had discovered and requesting surveillance on the red bag when it was picked up in Miami.

Arango set up a surveillance unit to cover Bahamasair International Flight 44 from Nassau when it landed in Miami. He told his people to look for a red suitcase with the brand name "Blue Light" on the handle. Arango or his agents saw the red suitcase as it was unloaded off Bahamasair Flight 44 in Miami, placed on the baggage cart, and wheeled to the Bahamasair baggage claim area. Arango saw Gray pick up the red suitcase, carry it approximately 12 or 15 feet, and set it alongside several black suitcases. A porter came shortly thereafter, picked up the black suitcase, but left the red suitcase and then followed Gray. Gaston then came into the baggage claim area and looked around as she was approaching the red suitcase. She picked up the red suitcase and was subsequently arrested by Arango near the front entrance of the airport.

A voter registration card bearing the name Feton Sutton, Duckett's Nassau alias, was found on Gaston, as were several personal papers belonging to Duckett and an address book with the initials J.D. Gray was also arrested as he was leaving the airport; a business card of Colebrook's was discovered in his possession. No one saw Duckett disembark in Miami from Flight 44.

This scenario makes it perfectly plain to me that the jury could reasonably infer that Duckett was a member of a conspiracy to import heroin and knowingly acted to further its end. That a conspiracy exists may be *easily* inferred from the actions of Colebrook, Gaston, and Gray, and evidence found on Gaston and Gray after they were arrested in Miami. That Duckett not only knew Colebrook, Gaston, and Gray, but also was closely associated with their illicit activity at the Bahamas Airport, is just as clear. These two inferences are insufficient to implicate him in the conspiracy. But what else might the jury reasonably infer? After DeMeritte placed two black suitcases at counter 16 and returned where the four were initially standing, Gaston and Gray had left to check in with the airlines, and Colebrook and Duckett was standing together. They had the red suitcase, a black suitcase, and a handbag. Colebrook asked DeMeritte to take the red suitcase past customs. The most obvious inference is that Colebrook wanted DeMeritte to believe that, in his capacity as a customs official, he was doing a special favor for one of the people he came to the airport with. Colebrook could not appear to be the approving customs official for his own luggage. He needed to appear to act for a traveler he had inspected. Duckett was his foil. The jury could reasonably infer that the conspirators intended for Colebrook to appear to be using his influence as a customs official to get Duckett's red suitcase through customs without further inspection. The jury could also reasonably infer that Duckett stood there while Colebrook gave his instructions to DeMeritte so that it would appear to DeMeritte that Colebrook was using his influence on Duckett's behalf and thus give to Colebrook's actions the desired appearance. Duckett's offering of an alias to Boeman (the same alias later found on Gaston), his falsehood about possession of a "friend's" luggage and passport, and his request to Boeman for some assurance that his luggage would not be inspected again by Miami customs, are equally inconsistent with the notion that Duckett was not a member of the conspiracy. Rather, the jury had every reason to infer that the remaining conspirators would not have conducted their criminal activity with an outsider in their midst who was actually watching and hearing the key event: the

diversion of the heroin-filled red suitcase past regular inspection.

This jury could have concluded that Duckett was an innocent lamb who just happened to wind up among friends who were heroin-smuggling wolves or that he knew exactly what was up and participated in the conspiracy. Since it is so reasonable to my mind that the likelihood he did not participate in the conspiracy "was too slim to be troubling" to the jury, *United States v. Alvarez*, 548 F.2d 542, 545 (5th Cir. 1977), I do not understand how we can reverse their verdict. Thus, I would affirm.