**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Augustus Charles BOBO, Jimmy Hancock, Jimmy Bruce Rowan, and Robert W. Kennington, Defendants-Appellants.**

**No. 77–5523.**

United States Court of Appeals,
Fifth Circuit.

Nov. 30, 1978.
Rehearing Denied Jan. 29, 1979.

356

John C. Rockett, Jr., Birmingham, Ala. (Court-appointed), Fred Blanton, Jr., Birmingham, Ala. (Court-appointed Co-counsel), for Bobo.

Roger C. Appell, Birmingham, Ala. (Court-appointed), for J. Hancock.

John Tucker, Jr., Birmingham, Ala., Rowan S. Bone, Gadsden, Ala., for Rowan.

J. Louis Wilkinson, Birmingham, Ala., for Kennington.

J. R. Brooks, U. S. Atty., Bill L. Barnett, Asst. U. S. Atty., Birmingham, Ala., for plaintiff-appellee.

Before TJOFLAT and HILL, Circuit Judges, and HIGGINBOTHAM,[*] District Judge.

TJOFLAT, Circuit Judge:

Jimmy Bruce Rowan, Jimmy Hancock, Robert W. Kennington and Augustus Charles Bobo were convicted by a jury of conspiring to possess and distribute heroin in violation of 21 U.S.C. § 841(a)(1) (1976). In addition, Jimmy Bruce Rowan was convicted of nine counts of possessing and aiding and abetting in the possession of heroin with intent to distribute,[1] in violation of 21 U.S.C. § 841(a)(1) (1976) and 18 U.S.C. § 2 (1976).[2] Rowan, Hancock, and Bobo were each sentenced to fifteen years on Count 1 of the indictment, the conspiracy count. Kennington was sentenced to ten years, to begin upon completion of a five-year state sentence he was already serving. Rowan was sentenced to fifteen years on each of the substantive counts, the first two terms to run consecutive to one another and to the sentence on Count 1, and the remaining seven terms to run concurrent with the prior terms.

Rowan claims (1) that his conviction is barred by the double jeopardy clause because it resulted from a retrial after the declaration of a mistrial to which he did not personally consent, (2) that the trial judge should have recused himself, (3) that a Government witness should have been barred from testifying for violation of Fed. R.Evid. 615, and (4) that a codefendant's confession was admitted in violation of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Hancock and Kennington challenge the sufficiency of the evidence against them. Bobo contends that he was prejudiced by the improper admission of hearsay evidence of an offense extrinsic to his indictment. We affirm as to all the appellants.

## I. FACTS

Only the Government presented evidence, and, according to the testimony of its witnesses, Jimmy Bruce Rowan operated a heroin distribution ring centered in Attalla, Alabama, from at least December of 1975 until his arrest in April 1977. Heroin was purchased from contacts in Detroit and Chicago and transported to Attalla, where it was cut and distributed for sale. Rowan's operation grew from approximately five people in 1975 to some fifty-two people at the height of the conspiracy in 1976, at which time a pound of heroin was being distributed each week. At that point it became evident that someone in the organization was "snitching," and a purge began. One member was murdered in July 1976, and the operation shrank until in April of 1977 only four trusted people were distributing four to six ounces a week.

Rowan was the ringleader of the operation. He made all of the buying trips to Chicago and Detroit, accompanied by one or more of the coconspirators. Jerry Thomas Grace, an unindicted coconspirator and the Government's chief witness, accompanied Rowan on several heroin buying trips from December 1975 until his arrest in August 1976. Grace was a user and would "shoot up" a sample of the heroin Rowan was buying to test its quality. He testified that Hancock was with them on one of these trips and was paid in heroin for coming along. He also testified to sales of substantial quantities of heroin to Kennington and Bobo.

---

[*] District Judge of the Northern District of Texas, sitting by designation.

[1.] One count charged Rowan alone with possession, aided and abetted by two other coconspirators. The other eight counts charged Rowan and one or more other persons, aided and abetted each by the other, of possession with intent to distribute.

[2.] Roger Dale Willet, Margaret Hancock, and Lavon Horton were tried along with appellants. Willet was convicted on the conspiracy count and one count of possession. He does not join this appeal. The indictment was dismissed as to Horton and Margaret Hancock on the Government's motion at the close of all the evidence.

On April 6, 1977, Rowan sold an ounce of heroin to an undercover agent named Larry Hahn. Rowan said he was going to make one more buying trip to Chicago and then stop for a year to let his name "cool off" with the investigative authorities. He offered to introduce Hahn to his source of supply in Chicago. The meeting was to have taken place in Chicago within the next few days, but Hahn did not go. Instead, stakeouts were set up in Attalla to await Rowan's return.

In the early hours of the morning of April 9, Rowan's car was spotted turning off the interstate into Attalla. Drug Enforcement Administration (DEA) agents and officers from the Attalla Sheriff's Department followed, and one of the officers saw defendant Roger Dale Willet jump out and run for the bushes. The car drove another twenty feet and then stopped in front of 901 West Fifth Avenue, the house owned by Rowan's father. As Rowan stepped out of his car, DEA agents approached him, identified themselves, and searched the car and Rowan. The only suspicious item discovered was a driver's license bearing the name Larry Pitt, which was found under the front seat of the car.

Willet was found about three hours later in the vicinity of the house next door to 901 West Fifth Avenue. Plastic packets containing ninety-five grams of heroin were found on the ground thirty feet away from where Willet was apprehended. He was taken into custody by the Sheriff's office. When arrested one month later on the charges for which he now stands convicted, Willet confessed that on April 8 and 9 he had made a trip with Rowan to Chicago, where Rowan had purchased four ounces of heroin. Upon arriving back in Attalla, Willet had noticed they were being followed by the police. Willet stated that in accordance with a prearranged plan, he had jumped from the car with the heroin and had hid-

den in the woods, where he was later found and arrested. He said that he had thrown the heroin to the ground before he was discovered.

The indictment named the appellants and fourteen others. Count 1 charged all defendants with conspiracy to possess heroin with intent to distribute. Counts 2 through 16 charged several of the conspirators with individual substantive offenses of possession with intent to distribute. Rowan was charged with fourteen counts of possession, Bobo with two, Kennington with two, and Hancock with one.[3] The appellants and five others were brought to trial on these charges on August 1, 1977. On August 3, a mistrial was declared when it became apparent that the defense attorney cross-examining Grace, the Government's star witness, had represented Grace twenty years earlier in connection with another matter. The two defendants represented by that attorney were severed from the case, and the second trial for the remaining seven defendants began the following Monday, August 8. Five were convicted, see notes 2, 3 supra; hence these appeals.

## II. ANALYSIS

Four defendants join in this appeal. Each appellant raises separate claims of error, and some join in the claims of others. We shall discuss the claims of each appellant in turn, with cross references where appropriate.

### A. Jimmy Bruce Rowan

We first discuss Rowan's contention that his second trial was held in violation of his rights under the double jeopardy clause.[4] A decision on this claim requires careful scrutiny of the circumstances surrounding the declaration of the mistrial. See Illinois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973).

---

**3.** Before the case was given to the jury, six of the substantive counts, including all those against Bobo, Kennington, and Hancock, were dismissed on the Government's motion. Thus, these three stand convicted only on the conspiracy count. Rowan was named in five of the dismissed counts. He stands convicted on the conspiracy count and nine counts of possession.

**4.** Hancock joins in this argument.

After the Government completed direct examination of its chief witness, Jerry Thomas Grace, Mr. Bone, who represented two of the defendants, began to cross-examine. The parties had all agreed that cross-examination by any one defendant would be on behalf of all, with each having the right to ask additional noncumulative questions in turn. Mr. Bone began to explore Grace's criminal record, at which point the following exchange took place:

Q [Mr. Bone] And I think your next offense was what, sir?

A [Grace] Murder.

Q Murder?

A Yes, sir. You were my attorney. You should remember it well.

Q All right. I represented you.
I think you plead guilty to manslaughter, did you not, sir?

MR. BARNETT [the Assistant U. S. Attorney]: Your Honor, may we approach—

A Yes, I did, when you didn't show up at my trial.

MR. BARNETT: May we approach the bench?

THE COURT: Yes, I think you should. Come over here.

Record, vol. 3, at 311–12.

At the subsequent sidebar conference, Mr. Barnett suggested that Mr. Bone's prior representation of Grace raised a possible sixth-amendment-effective-representation question since his knowledge of privileged matters might limit the scope of his cross-examination to the detriment of the interests of his clients then on trial. Mr. Bone said he could not recall ever having represented Grace. Mr. Bowen, counsel for Rowan and acknowledged lead counsel for all the defendants, indicated he thought the possibility of prejudice remote in view of the fact that the alleged prior representation had taken place twenty years previously. *Id.* at 313. The Government said it would not be willing to go forward unless the conflict of interest were waived on the record by the defendants involved. At this point the jury was excused, after which the witness testified, in the presence of the defendants, that Mr. Bone had been paid to represent him in connection with a murder charge in 1958, that Mr. Bone accepted the money and discussed the case with Grace but did not represent him, and that Grace pleaded guilty to manslaughter on the advice of another attorney. *Id.* at 316–17. Grace also said that in the early part of 1976, during the time of the conspiracy alleged in the indictment, he had consulted Mr. Bone, at the advice of Rowan, about a charge of possession of three grams of heroin, an incident related to the case on trial. *Id.* at 319–20. Grace did not employ Mr. Bone to represent him at that time. Mr. Bone insisted that he could not recall that conversation either, *id.* at 321, and that he would have no record of it since he had not been engaged, *id.* at 335.

The court then indicated that it was prepared to permit Mr. Bone to continue cross-examination with the understanding that he would not utilize any information he might possess as a result of prior representation of or conversation with the witness. *Id.* at 322. The Government objected that any such limitation would deprive Mr. Bone's clients then before the court of effective assistance of counsel. The court responded with the suggestion that it would permit Mr. Bone, if he wished, to state to the court, in the presence of the jury, that his memory had been refreshed as to his prior representation of the witness and in view of that fact he would cease cross-examination. The court indicated that counsel for the other defendants would have to agree to this procedure since "this thing affects everybody," an apparent reference to the prior agreement that cross-examination by one counsel would be on behalf of all defendants. The court then said, "I could well declare a mistrial on it." *Id.* at 323.

At this point the conference moved to the judge's chambers, out of the presence and hearing of the defendants. The court solicited suggestions from all counsel present and was apparently persuaded by the U. S. Attorney that any procedure limiting the scope of Mr. Bone's cross-examination

would be reversible error. *Id.* at 330–33. Mr. Bone said that he could not truthfully state to the court that his memory had been refreshed because he did not recall being engaged to represent Grace and his records did not go back that far. *Id.* at 334–35. This left a mistrial or the employment of cautionary instructions, without any restraint on the scope of cross-examination, as the only available options of those already discussed. The court was apparently concerned that it would be difficult to counteract by corrective instructions the prejudice possibly arising from what the jury had already heard. *Id.* at 331.

The judge then retired to his library and conferred briefly with Messrs. Bowen, Wilkinson (counsel for defendant Kennington), and Barnett. The reporter was not present to record this colloquy. At the commencement of the second trial, however, in conjunction with his motion to dismiss on grounds of double jeopardy, Mr. Bowen stated that at that conference in the library the judge had asked,

> if we [Mr. Bowen, Mr. Wilkinson, and the U. S. Attorney] thought there was anything that could be done to straighten that situation, . . . without declaring a mistrial. And at that time both myself and Mr. Wilkinson informed the Court that in our opinion any instructions or straightening out of the matter would be more prejudicial than what had already happened. And we agreed to a mistrial.

*Id.,* vol. 4, at 11. No one then present objected that there might be a double jeopardy problem. They then rejoined the other counsel in chambers, and the judge announced that he had decided that instructions to the jury could not remove the prejudice as to all defendants since the interests of all were implicated by the conspiracy count. The only solution was to declare a mistrial, and he had requested that Mr. Bowen make the motion in open court, in which other counsel could join if they

wished. *Id.,* vol. 3, at 335, 337. No one expressed any objection to this procedure. They all then returned to the courtroom, the motion was made by Mr. Bowen, joined by counsel for all the other defendants, and was granted. Mr. Bone's clients were severed from the case,[5] and it was set down for trial on August 8, the following Monday. At the commencement of the second trial, before the jury was empaneled, Mr. Bowen moved to dismiss the indictment on grounds of former jeopardy. The motion was denied.

 The general legal principles applicable in this area are relatively clear. The bar of the double jeopardy clause operates to protect an accused against multiple prosecutions or multiple punishments for the same offense. *United States v. Dinitz,* 424 U.S. 600, 606, 96 S.Ct. 1075, 1079, 47 L.Ed.2d 267 (1976). Jeopardy attaches at the empaneling and swearing in of the jury, *Crist v. Bretz,* 437 U.S. 28, 35, 98 S.Ct. 2156, 2160, 57 L.Ed.2d 24 (1978); *Downum v. United States,* 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963), and from then on, consideration must be given to the defendant's "valued right . . . to have his trial completed by the particular tribunal summoned to sit in judgment on him." *Id.* at 736, 83 S.Ct. at 1034. When that right is denied by declaration of a mistrial at the behest of the prosecution or on the court's own motion, reprosecution is prohibited unless there is a "manifest necessity for the [mistrial] or the ends of public justice would otherwise be defeated." *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824); *accord, Arizona v. Washington,* 434 U.S. 497, 504, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978); *United States v. Evers,* 569 F.2d 876, 878 (5th Cir. 1978). By contrast, where the defendant moves for a mistrial or consents to its declaration, ordinarily the double jeopardy clause does not bar his retrial. *United States v. Scott,* 437 U.S. 82, 93, 98 S.Ct. 2187, 2195, 57 L.Ed. 2d 65 (1978); *Lee v. United States,* 432 U.S. 23, 32, 97 S.Ct. 2141, 2147, 53 L.Ed.2d

**5.** This was done to give them time to secure new counsel if they desired. Their right to do so, or to continue to be represented by Mr. Bone, was made known to them at a hearing held after the jury was dismissed. Record, vol. 3, at 344–45.

80 (1977); *United States v. Jorn,* 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971) (plurality opinion); *United States v. Crouch,* 566 F.2d 1311, 1317 (5th Cir. 1978).

Rowan does not contest these principles. Rather, he contends that although a motion for mistrial was made by his counsel in this case, he cannot be said to have consented to the termination of his first trial. In his view, his rights under the double jeopardy clause are personal to him and cannot validly be relinquished except by a waiver that accords with the "knowing, voluntary, and intelligent" standards of *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Since he did not affirmatively assent on the record to his counsel's motion, the mistrial in this case, he argues, must be regarded as having been declared by the judge sua sponte, and its double jeopardy effect must be examined under the exacting standards of "manifest necessity."

Not too long ago, this court expressed agreement with Rowan's position. *Galloway v. Beto,* 421 F.2d 284, 288 n.4 (5th Cir. 1972), *cert. denied,* 400 U.S. 912, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970); *see United States v. Dinitz,* 492 F.2d 53, 59 (5th Cir.), *aff'd en banc,* 504 F.2d 854 (5th Cir. 1974), *rev'd,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). In recent years, however, the Supreme Court has written extensively on double jeopardy principles and has made it clear that mistrial requests are not to be judged by the *Johnson v. Zerbst* standards. We think this case is controlled by *United States v. Dinitz,* in which the Supreme Court said:

> The respondent characterizes a defendant's mistrial motion as a waiver of "his right not to be placed twice in jeopardy" and argues that to be valid the waiver must meet the knowing, intelligent, and voluntary standard set forth in *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1692, 82 L.Ed. 1461. This approach erroneously treats the defendant's interest in going forward before the first jury as a constitutional right comparable to the right to counsel. It fails to recognize that the

protection against the burden of multiple prosecutions underlying the constitutional prohibition against double jeopardy may be served by a mistrial declaration and the concomitant relinquishment of the opportunity to obtain a verdict from the first jury. This Court has implicitly rejected the contention that the permissibility of a retrial following a mistrial or a reversal of a conviction on appeal depends on a knowing, voluntary, and intelligent waiver of a constitutional right. See *Breed v. Jones,* 421 U.S. 519, 534, 95 S.Ct. 1779, 1788, 44 L.Ed.2d 346, 358; *United States v. Wilson,* 420 U.S. 332, 343–344, n.11, 95 S.Ct. 1013, 1021–1023, 43 L.Ed.2d 232, 242–243; *United States v. Jorn,* 400 U.S. 470, 484–485, n.11, 91 S.Ct. 547, 556–557, 27 L.Ed.2d 543, 556–557 (plurality opinion); *United States v. Tateo,* 377 U.S. 463, 466, 84 S.Ct. 1587, 1589, 12 L.Ed.2d 448, 450.

424 U.S. at 609 n.11, 96 S.Ct. at 1080–81.

*Dinitz* involved the declaration of a mistrial after the judge had excluded from the trial one of the defendant's two counsel (erroneously in the view of the Court of Appeals) for repeated disregard of the court's instructions. Faced with the options of continuing the trial without the assistance of his lead attorney or foregoing a jury possibly favorably disposed to his cause, the defendant, through counsel, moved for a mistrial, and his motion was granted. Reversing the decision of this court en banc, the Supreme Court held that putting the defendant to such a "Hobson's choice," even as a result of a mistaken ruling of the court or misstep by the prosecutor, does not vitiate the validity of the defendant's consent to a mistrial.

> [T]raditional waiver concepts have little relevance where the defendant must determine whether or not to request or consent to a mistrial in response to judicial or prosecutorial error. . . . The important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the

course to be followed in the event of such error.[6]

*Id.* at 609, 96 S.Ct. at 1080 (footnote omitted). We see no reason to apply a different rule when the error precipitating the mistrial was committed by the defense, rather than by the judge or the prosecutor.[7] Indeed, there are persuasive reasons why a waiver requirement is even less appropriate under these circumstances.

▪▪▪ A basic policy[8] of the double jeopardy clause is to prevent *government-induced* multiple prosecutions for the same crime. *United States v. Scott,* 437 U.S. at 92, 98 S.Ct. at 2194. When the prosecutor or the court acts in such a way that the defendant feels compelled to move for a mistrial, the Government can be said to be responsible, in some sense, if the trial is terminated. But the teaching of *Dinitz* is that such a motion precludes a subsequent plea of former jeopardy in all cases except where the Government has acted in bad faith. When a defendant successfully moves for or consents to a mistrial declared as a result of his own error, the Government is in no sense responsible. Yet a

*Johnson v. Zerbst* waiver requirement would bar retrial after such a termination unless it were shown that the defendant had knowingly concurred, understanding all the consequences and alternatives. *Cf. Boykin v. Alabama,* 395 U.S. 238, 242, 89 S.Ct. 1709, 1711, 23 L.Ed.2d 274 (1968) (record must affirmatively show that accused voluntarily and understandingly entered guilty plea). We agree with the District of Columbia Circuit that a waiver requirement would go too far.

> The startling implication of barring reprosecution after a mistrial brought about by defense counsel's own errors and on his own motion is that the government could irrevocably lose the right to prosecute for a given crime without itself having committed the least impropriety, and with the trial judge having erred only in declining to second guess defense counsel as to the accused's best interests.

*United States v. Jamison,* 164 U.S.App.D.C. 300, 306, 505 F.2d 407, 413 (1974), *cited with approval in United States v. Dinitz,* 424 U.S. at 609, 96 S.Ct. at 1080.[9] This is one of

---

**6.** Rowan contends that this last-quoted sentence places control with the defendant rather than his counsel, and argues that the defendant is not in control if his consent is not sought. We do not agree. The statement places control with the defendant rather than the *court*; it does not differentiate between the defendant and his counsel. It is common practice to refer to a party and his counsel as a single entity carrying the name of the party. Thus, we state throughout this opinion that "Rowan" makes various arguments, although in each case the contentions have been made by counsel on Rowan's behalf. Counsel uses the same convention. *E. g.,* Brief for Appellant Rowan at 14. That the Supreme Court did not intend to single out the defendant, as distinguished from his attorney, is further indicated by the fact that footnote 11 to the Court's opinion in *Dinitz,* 422 U.S. at 609, 96 S.Ct. at 1080, quoted in the text *supra,* which directly contradicts Rowan's argument, appears in that opinion appended to the end of the last sentence quoted here.

**7.** It was counsel for two of Rowan's codefendants whose actions brought about the mistrial. However, by agreement of the parties, the actions of any one defendant or his counsel inured to the benefit, or prejudice, of all.

**8.** The Supreme Court has said that historically "the primary purpose of the Double Jeopardy

Clause was to protect the integrity of a final judgment." *United States v. Scott,* 437 U.S. 82, 92, 98 S.Ct. 2187, 2194, 57 L.Ed.2d 65 (1978). The doctrine, however, has developed in the United States that a defendant may have been put in jeopardy, as here, even though his trial does not end in a judgment of conviction or acquittal. *Crist v. Bretz,* —— U.S. ——, ——, 98 S.Ct. 2156, 2159–60, 57 L.Ed.2d 24 (1978).

> The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States,* 355 U.S. 184, 187–188, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957), *quoted in United States v. Scott,* 437 U.S. at 87, 98 S.Ct. at 2192.

**9.** A waiver requirement would also make it possible for an unethical defense attorney to secure his client's freedom by intentionally causing a mistrial. The grant of a mistrial motion based on counsel's deliberate miscon-

those instances where "a defendant's valued right to have his trial completed by a particular tribunal must . . . be subordinated to the public's interest in fair trials designed to end in just judgments." *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949).[10]

■ On the record before us, even if we accept Rowan's argument that his motion should be regarded as a mere formality because the judge requested that it be made, there can be no doubt that Rowan, through counsel, consented to the mistrial. *See* Record, vol. 4, at 11. It remains then only to determine whether this consent was somehow coerced or unfairly obtained, since "[t]he Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial requests." *United States v. Dinitz,* 424 U.S. at 611, 96 S.Ct. at 1081; *accord, Lee v. United States,* 432 U.S. 23, 32, 97 S.Ct. 2141, 2147, 53 L.Ed.2d 80 (1977); *United States v. Jorn,* 400 U.S. 470, 485 n.12, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971) (plurality opinion). Rowan makes no serious argument that prosecutorial or judicial overreaching occurred here,[11] and our own review of the record reveals none. It was defense counsel's actions that created the problem. When it became clear that Mr. Bone had a prior connection with the witness, the U. S. Attorney, quite properly in our view, pointed out to the court the possible sixth

amendment violation. Although it was the judge who first raised the possibility of mistrial in the extended discussion that followed, he at no time pressed for it and repeatedly sought suggestions from everyone as to how a mistrial could be avoided. Record, vol. 3, at 331; *id.,* vol. 4, at 6, 11. Nor did the U. S. Attorney at any time press for a mistrial. He stated, "The Government would not want to go forward," unless the conflict were waived on the record, *id.,* vol. 3, at 315, and he thought that a "guaranteed reversal" would result if any limitation were placed on the scope of Mr. Bone's examination, *id.* at 330.

■ We do not deem it improper for the Government to resist a procedure that it in good faith believes may lead to the setting aside of a conviction, and we see no reason on this record to doubt the Government's good faith. The U. S. Attorney had no prior knowledge of the conflict of interest, and it came out on cross, not direct, examination. We need not decide whether a valid claim of ineffective assistance of counsel could have been made if the trial had continued. *But see generally Castillo v. Estelle,* 504 F.2d 1243 (5th Cir. 1974). We decide only that the U. S. Attorney's belief that a problem existed was not so patently baseless as to render his objections grossly negligent or intentional misconduct.[12] If

duct without securing the defendant's consent would bar reprosecution if we accepted Rowan's argument. We do not say that this would happen often, but its possibility is sufficiently real that we think it appropriately considered in our assessment of the likely "implications of [the rule urged upon us] for the sound administration of justice." *United States v. Tateo,* 377 U.S. 463, 466, 84 S.Ct. 1587, 1589 (1964).

10. We find further support for our decision today in the knowledge that the Supreme Court has consistently refused to adopt a waiver theory to explain why a defendant who successfully appeals his conviction on any ground other than sufficiency of the evidence may be retried without offending the double jeopardy clause. *Burks v. United States,* 437 U.S. 1, 15, n.9, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978) (holding retrial not permitted after reversal for insufficiency of the evidence and rejecting by implication waiver rationale for permissibility of retrial after reversal for other reasons);

*Green v. United States,* 355 U.S. 184, 197, 78 S.Ct. 221, 229, 2 L.Ed.2d 199 (1957); *Kepner v. United States,* 195 U.S. 100, 135, 24 S.Ct. 797, 807, 49 L.Ed. 114 (1904) (Holmes, J., dissenting).

11. We have said that overreaching occurs when the Government acts intentionally or with gross negligence to prejudice so seriously a defendant that he moves for a mistrial as the only alternative to an assured conviction. *United States v. Kessler,* 530 F.2d 1246, 1256 (5th Cir. 1976).

12. We also need not decide whether a mistrial was the only proper course of action to be followed since there can be no doubt that Rowan, through counsel, agreed at the time that it was. *See* Record, vol. 4, at 11. Why no one suggested that a mistrial be declared only as to Mr. Bone's two clients and that the trial continue as to the others, we cannot say. It may be

the defendants believed they were being unfairly pressured, they had only to decline to make the requested motion, which would have put the prosecutor and the judge to the task of deciding if manifest necessity required a mistrial.

We hold that the appellants freely and without any misconduct on the part of the prosecutor or the judge consented, through counsel, to the declaration of a mistrial. That consent removes any bar to retrial; the defendant's personal concurrence is not required.

We turn now to Rowan's other allegations of error.[13] We find no merit in his contention that the trial judge should have recused himself. The only statement by the judge that could reasonably be considered to indicate any bias against Rowan was clearly based on facts that the judge had learned in the course of prior proceedings in the case.[14] The alleged bias was thus judicial, not personal, and would have been insufficient to require the granting of a motion to recuse if one had been made at the time. *United States v. Archbold-Newball,* 554 F.2d 665, 682 (5th Cir.) *cert. denied,* 434 U.S. 1000, 98 S.Ct. 644, 54 L.Ed.2d 496 (1977); *In Re Grand Jury Proceedings,* 559 F.2d 234, 237 (5th Cir. 1977).

Nor do we think it reversible error that the trial judge refused to prevent from testifying a Government witness who remained in the courtroom notwithstanding the court's sequestration order. At the beginning of both trials, the defendants invoked the rule, and all witnesses were ordered to leave the courtroom. Throughout both trials, however, James Reed, an agent with the DEA, remained in the courtroom seated at the Government's table. When he was called to testify for the prosecution, the defendants objected that he had not been excused from the rule. The court overruled the objection and refused to exclude his testimony.

Fed.R.Evid. 615, which provides for the sequestration of witnesses, contains an express exception intended to permit an investigative agent to remain in court even though he will be called as a witness. *United States v. Auten,* 570 F.2d 1284 (5th Cir. 1978); Advisory Committee Note to Rule 615, 28 U.S.C.A. Rules of Evidence at 446 (1975). We need not decide whether this exception applies to this case since, even if there were a violation of the rule, "the defendants must demonstrate that the [violation] created sufficient prejudice to require reversal." *United States v. Warren,* 578 F.2d 1058, 1076 (5th Cir. 1978) (en banc) (footnote omitted). The appellants make no specific showing of prejudice here; their only argument is that it is always reversible error to permit a witness to testify after he has heard the testimony of other witnesses. We expressly rejected this contention in *Warren. Id.*

Rowan also argues that the confession given by his codefendant Willet when Willet was arrested was admitted into evidence in violation of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).[15] In the course of the first trial, a

that everyone felt that all the defendants were affected because of the conspiracy count and that cautionary instructions could not correct the harm already done. *See id.,* vol. 3, at 335 (court states, "everybody is in the same boat on the conspiracy count," and that cautionary instructions could not remove the prejudice as to all defendants). In any event, the time to suggest this alternative was then and there, not here on appeal. The appellants cannot now attack the result, which they fully agreed was proper at the time, on the ground that an alternative solution was available but not considered.

**13.** Hancock and Bobo join in these arguments.

**14.** At a conference in chambers prior to the commencement of the second trial, in the course of denying the double jeopardy motion, the judge said, "there is no way in the world, in my judgment, that the law would give these people a free ride in a narcotics case of this type with the record that these people have got." Record, vol. 4, at 13.

**15.** In *Bruton,* the Supreme Court held that the admission of a codefendant's confession implicating the defendant violated the defendant's sixth amendment confrontation rights when the confessor did not take the stand. We have held that, consistent with *Bruton,* such a confession may be admitted against the confessing codefendant if all incriminating references to

suppression hearing was held, out of the presence of the jury, to determine the admissibility of Willet's statement. Record, vol. 3, at 112–165. At that time the judge ruled that the statement had been voluntarily and understandingly made and that it was admissible against Willet but not against any of the other defendants. *Id.* at 161. The court also said that references to the other defendants by name would have to be deleted. *Id.* The first trial was aborted before the statement was offered. At the second trial, the transcript of the suppression hearing was made part of the record. *Id.*, vol. 4, at 432. When the statement was offered, and again at the close of all the evidence, the court carefully instructed the jury that it was to consider the confession on the issue of Willet's guilt or innocence only and not in relation to any

other defendant. The statement, edited to refer to Rowan [16] as "the other person," was then admitted and read to the jury. Rowan moved for a severance on the ground that although his name had been deleted, other facts recited in the statement, when viewed along with other evidence already in the record, would lead the jury inescapably to conclude that Rowan was the "other person" in Willet's statement.[17]

■ Because this is a conspiracy case involving several defendants and a multicount indictment, we have carefully examined the record for any sign that Rowan might have been prejudiced by the admission of Willet's confession in its redacted form.[18] We are convinced, beyond any doubt, that any violation of *Bruton* which may have occurred here was harmless. *See Brown v. United States,* 411 U.S. 223, 231–

---

the defendant are deleted. *E. g., United States v. Gray,* 462 F.2d 164 (5th Cir.), *cert. denied,* 409 U.S. 1009, 93 S.Ct. 452, 34 L.Ed.2d 303 (1972); *Posey v. United States,* 416 F.2d 545, 550 (5th Cir. 1969), *cert. denied,* 397 U.S. 946, 90 S.Ct. 965, 25 L.Ed.2d 127 (1970). The precise question presented here—whether, in addition to the defendant's name, references to places and events that render the confession inculpatory when read together with other independent evidence in the record must also be deleted—has never been decided in this circuit. *But cf. United States v. Hicks,* 524 F.2d 1001, 1003 (5th Cir. 1975) (only confessions which "directly inculpate" the defendant must be excluded), *cert. denied,* 424 U.S. 946, 96 S.Ct. 1417, 47 L.Ed.2d 353, *cert. denied,* 425 U.S. 953, 96 S.Ct. 1729, 48 L.Ed.2d 197 (1976). The Sixth Circuit has held that a redaction to replace the defendant's name with "blank" is not enough if the jury would be compelled by other evidence in the case to infer that the defendant was "blank." *Hodges v. Rose,* 570 F.2d 643 (6th Cir.), *cert. denied,* 436 U.S. 909, 98 S.Ct. 2244, 56 L.Ed.2d 408 (1978). Because we decide that any error here was harmless, we need not resolve this issue.

16. Rowan was the only other person specifically named in the statement.

17. As read to the jury, Willet's statement said that on April 7, 1977, he had driven with the "other person" from the Trade Winds Motel in Destin, Florida, to Chicago in a black 1969 Lincoln. In Chicago, Willet got a motel room in the name Larry Pitt and the "other person" had a contact meet him there and sell him four pounds of heroin. The statement then said that they drove to Attalla, Alabama, arriving about

2:20 a. m. on April 9, where Willet noticed the police were following. He jumped out and hid the heroin in the bushes. Independent evidence established that Rowan owned the Trade Winds Motel and usually drove a black 1969 Lincoln. Police officers testified that they knew of the planned trip and were waiting for Rowan when he returned to Attalla. One officer testified that he saw Willet jump out before the car stopped and this same officer and one other testified that when the car stopped, they saw Rowan step out. A search of the car produced a driver's license in the name of Larry Pitt. Willet was found hiding nearby about three hours later and was arrested. Three and a half pounds of heroin were found in the bushes thirty feet from where Willet was hiding. Rowan also points to the fact that he is the only other person named along with Willet in Count 16 of the indictment and overt act 29 in Count 1, the only places in the indictment where Willet is named. In light of all this, he argues, the jury could not fail to connect him with Willet's confession.

18. Appellants Bobo and Hancock join this argument on appeal. Their claims of prejudice are clearly without merit. The statement, as read to the jury, implicated Willet and two other unnamed persons. No independent evidence of any kind associated either Hancock or Bobo with any of the events in the statement, nor were they named in Count 16 or overt act 29 of the indictment. See note 17 *supra.* We think that the judge's careful cautionary instructions eliminated any likelihood that the jury would have associated Bobo or Hancock with the statement.

32, 93 S.Ct. 1565, 1570–71, 36 L.Ed.2d 208 (1973); *Chapman v. California*, 386 U.S. 18, 22–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967). The other evidence against Rowan was overwhelming. Three coconspirators testified to numerous occasions on which Rowan or other persons acting on his instructions purchased large amounts of heroin that were transported to Attalla for resale. The Government also presented the testimony of Agent Hahn, who, while working undercover, was taken to meet Rowan in Destin, Florida, by an informant. Hahn testified that Rowan told him that his organization once had fifty-two people working in it but was then down to four people dealing in four to six ounces of heroin a week. Record, vol. 4, at 668. Rowan also sold Hahn an ounce of heroin for $1,200 and offered to sell him more at the same price later.

The events recited in Willet's statement relate to only one of nineteen overt acts in the conspiracy count that name Rowan. Upon our own reading of the record and after consideration of what seems to us to have been the probable impact of the confession on the minds of an average jury, *see Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969), we find that there is no reasonable possibility that this evidence prejudicially contributed to the conviction, *see Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed.2d 340 (1972).

There is one count on which Rowan was convicted as to which the alleged error in admitting Willet's confession may not have been harmless. Count 16 charged Rowan with possessing and aiding and abetting Willet in the possession of heroin on April 9, 1977. Willet's confession speaks directly to this count. Having rejected Rowan's other claims of error, however, we affirm his conviction on Counts 1, 2, and 3—the counts as to which consecutive sentences were imposed—and pretermit review of his conviction on Count 16, the sentence on which runs concurrent with the sentences on the first three counts. *See Greene v. United States*, 358 U.S. 326, 330, 79 S.Ct. 340, 342, 3 L.Ed.2d 340 (1959); *United States v. Littrell*, 574 F.2d 828, 831 (5th Cir. 1978).

### B. *Jimmy Hancock*

Hancock contends that the evidence is insufficient to support his conspiracy conviction. Although the evidence against Hancock is less compelling than that against Rowan, we find that the jury could reasonably have concluded that his guilt had been proved beyond a reasonable doubt.

 In a drug conspiracy case, to prove an individual's participation, the Government must prove that the conspiracy existed, that the accused knew of its existence, and, with that knowledge, voluntarily joined it. *United States v. Littrell*, 574 F.2d 828, 832 (5th Cir. 1978); *United States v. Garza*, 574 F.2d 298, 304 (5th Cir. 1978). Since secrecy is the norm in conspiracies, their existence and the participation of individuals in them may be proved through circumstantial evidence. *United States v. Evans*, 572 F.2d 455, 468 (5th Cir. 1978). We must affirm if it can be said that the jury could reasonably find that the evidence was inconsistent with every reasonable hypothesis of innocence. *United States v. Littrell; United States v. Garza; United States v. Duckett*, 550 F.2d 1027, 1030 (5th Cir. 1977).

Our affirmance of Rowan's conviction shows that the Government established the existence of a conspiracy beyond a reasonable doubt. Hence, the issue here is Hancock's knowing participation in it. All of the evidence against Hancock came in through Grace, the Government's witness. He testified that, in the second week of March 1976, he made a trip to Detroit with Rowan, Hancock, and two other persons. After taking the two others to their home in Detroit, Rowan, Grace, and Hancock checked into a motel. The next day they went to the house of one Jack Haynes, where Rowan made a call to Chicago to arrange to buy some heroin. They all then drove to Chicago and checked into another motel. Rowan and Grace left and bought a half pound of heroin from Rowan's source. They returned and met Haynes and Han-

cock at the motel, where Haynes was paid off with an ounce of the heroin that Rowan had just bought. Grace, Rowan, and Hancock then drove back to Attalla. Margaret Hancock, Jimmy's wife, was waiting for them at Rowan's house. Rowan cut the heroin, i. e., diluted it by mixing it with nonnarcotic powders, in the presence of the Hancocks, Grace, and Rowan's wife. Margaret Hancock was then given four or five grams of the cut heroin.

Although we find this case a close one, we cannot say that the jury could not reasonably conclude that every reasonable hypothesis inconsistent with guilt had been dispelled. The only hypothesis of innocence possible on these facts is that Hancock was just along for the ride, that he didn't overhear Rowan's call setting up the buy, and that he didn't know heroin was being carried back to Attalla in the car in which he was riding. We think the jury could reasonably have inferred that Hancock must have known what was going on. He was intimately connected with the conspirators over the course of two days and was present when the heroin was cut. We are mindful of the admonition that presence alone is insufficient to establish participation in a conspiracy, *United States v. Di Re,* 332 U.S. 581, 593, 68 S.Ct. 222, 228, 92 L.Ed. 210 (1948); *United States v. Duckett,* 550 F.2d at 1030, but more than mere presence was involved here. The record clearly established that it was the practice in Rowan's organization to give people heroin for going along on buying trips. Record, vol. 4, at 154, 165, 195–96, 365, 375, 381. We think the jury could reasonably infer that the heroin given to Margaret Hancock was Jimmy's share for making the trip.

We also think this is a proper case for application of the "slight evidence" standard. Once an individual is shown to be clearly connected to the conspiracy group, only slight additional evidence is required to support the inference that his participation was knowing. *United States v. Alvarez,* 548 F.2d 542, 544 (5th Cir. 1977); *United States v. Duckett,* 550 F.2d at 1031. Notwithstanding Hancock's argument to the contrary, his connection with the conspiracy is established by his participation in the March drug buying trip. The payoff to Hancock's wife, in the context of all the evidence in the case, was sufficient to support beyond a reasonable doubt the inference of Hancock's knowing participation. This is not a case like *Duckett,* where the links between the defendant and the conspiracy were too tenuous to support the necessary inferences.[19] Here, "the circumstances [of Hancock's] participation in [the] established conspiracy . . . become substantial from their weight in position and in context, though in abstraction they may seem only slight." *Phelps v. United States,* 160 F.2d 858, 867–868 (8th Cir. 1947), *cert. denied,* 334 U.S. 860, 68 S.Ct. 1525, 92 L.Ed. 1780 (1948), *quoted in United States v. Duckett,* 550 F.2d at 1031. *See United States v. Baldarrama,* 566 F.2d 560, 566 (5th Cir. 1978). This case is more like *United States v. Garza,* in which the defendant Torres claimed he was only the unknowing bodyguard of and chauffeur to a drug importer and not a member of the conspiracy. On the basis of evidence that Torres had attended meetings at which the conspiracy had been discussed and had made trips with other conspirators to inspect future landing sites for airplanes bringing in marijuana, the court held there was ample evidence to exclude his claims of ignorance. The evidence against Hancock is perhaps not as compelling as in *Garza,* but we conclude that the likelihood of Hancock's total ignorance of what was going on around him was "too slim to be troubling" to the jury. *United States v. Alvarez,* 548 F.2d at 545.

**19.** In *Duckett,* the evidence revealed a conspiracy to import heroin into the United States by bribing a porter to get a suitcase containing the drugs onto a plane without going through customs. Although Duckett was at the airport with the other defendants, it was never proved that he handled the suitcase at any time or knew that it contained contraband. The court held that Duckett's use of an alias and some of his other actions were suspicious but not inconsistent with several reasonable hypotheses of innocence and therefore overturned his conviction.

■ We have carefully considered Hancock's other contentions [20] and find them without merit. Therefore, we affirm his conviction.

## C. Robert W. Kennington

Kennington also challenges the sufficiency of the evidence to convict him. Applying the same standards discussed above in regard to appellant Hancock, we find ample evidence to support the jury's verdict.

The evidence against Kennington, recounted in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), reveals three instances connecting him with the conspiracy. Grace testified that in February 1976 Rowan sent him to Birmingham to stay with Kennington. Grace stayed three or four days, dispensing drugs and collecting the money from Kennington's sales to bring back to Rowan. He also testified that in April of the same year he and another coconspirator, on instructions from Rowan, delivered eight ounces of heroin to Bobo in Attalla. At that time, Bobo said he already had an order for one ounce from Kennington. Later that day Grace talked to Kennington and confirmed that he was buying an ounce. Bobo arrived, and Grace saw him hand Kennington a small plastic package that Bobo said contained an ounce of heroin. No money changed hands at that point. Kennington owed Grace some money, and Grace asked to be paid off in heroin from the ounce Kennington had just received. Kennington refused, saying that he had purchased it for someone else and it was not his property. Finally, Grace testified that late in April of 1976, he made a trip with Rowan and another man. They drove from Attalla to Birmingham, where Kennington met them and purchased an ounce of heroin. They then drove to Destin, Florida, where Rowan was negotiating to purchase a motel. The next day they returned to Birmingham and again met with Kennington, who purchased another six ounces of heroin for ten or twelve thousand dollars in cash.

■ Kennington contends that his conviction must be reversed because it was never proved that the substance he received on these three occasions was heroin. In support, he points out that the Government dismissed the substantive counts of possession against him at the close of the evidence, apparently because it believed the identity of the powder had not been

---

20. Hancock urges upon us the "isolated transaction" doctrine developed by the Second Circuit in a line of cases beginning with *United States v. Reina,* 242 F.2d 302, 306 (2d Cir.), *cert. denied,* 354 U.S. 913, 77 S.Ct. 1294, 1 L.Ed.2d 1427 (1957). As summarized by that court:

> For a single act to be sufficient to draw an actor within the ambit of a conspiracy to violate the federal narcotics laws, there must be independent evidence tending to prove that the defendant in question had some knowledge of the broader conspiracy, or the single act itself must be one from which such knowledge may be inferred.

*United States v. DeNoia,* 451 F.2d 979, 981 (2d Cir. 1971).

This seems to us to be merely another way of articulating the principle embodied in this circuit's rule that a member of a conspiracy need not know of every transaction in the illegal scheme, so long as he knows of its general scope. *United States v. James,* 576 F.2d 1121, 1126 (5th Cir.), *petition for rehearing en banc granted, id.* at 1132 (1978); *United States v. Elliott,* 571 F.2d 880, 903–904 (5th Cir. 1978); *see United States v. Marable,* 574 F.2d 224 (5th Cir. 1978). Because of the large amount of heroin (half a pound, uncut) obtained on the trip and because he saw it being cut to produce an even greater quantity, Hancock must have known that resales were contemplated. It is often the nature of drug distribution conspiracies to engage in ongoing operations and not to disband after completing one transaction. *United States v. Gonzalez,* 491 F.2d 1202, 1206 (5th Cir. 1974). Simply because Hancock was not along on other trips does not disassociate him from the conspiracy's continuing activities, *see id.* at 1207, and once having joined the conspiracy and not having withdrawn he cannot insulate himself from the actions of his coconspirators.

Hancock also argues that there was a prejudicial variance between the indictment, which charged one conspiracy, and the proof, which showed three unrelated conspiracies. What we have said above sufficiently establishes the interdependence of the participants and that all had a common end or single unified purpose. *See United States v. Elliott,* 571 F.2d at 900–01. We think the proof showed a single conspiracy.

proved.[21] This argument is easily answered. It is an established principle that an acquittal on the substantive offense does not preclude a conviction for conspiracy to commit the same offense. *United States v. Dearden,* 546 F.2d 622, 624 (5th Cir. 1977), cert. denied, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977); *United States v. Carlton,* 475 F.2d 104, 106 (5th Cir.), cert. denied, 414 U.S. 842, 94 S.Ct. 100, 38 L.Ed.2d 80 (1973). If acquittal on the possession counts would not have prevented Kennington's conspiracy conviction, dismissal of the charges by the Government can have no greater effect. The Government had only to prove that Kennington knew of the conspiracy and with that knowledge voluntarily joined it. *United States v. Gordon,* 580 F.2d 827, 834 (5th Cir. 1978).

Withdrawal of the substantive counts does not, as appellant appears to suggest, preclude consideration by the jury of the evidence presented. That evidence was highly relevant to the conspiracy charge, and two of the three incidents were charged as overt acts.[22] We think the circumstantial evidence sufficient to prove that what Kennington purchased was heroin. *See United States v. Crisp,* 563 F.2d 1242, 1244 (5th Cir. 1977). Even if this were not so, however, to prove that Kennington was a knowing participant in the conspiracy, it need not be shown that the substance was in fact heroin as long as he thought he was buying a controlled substance and believed he was furthering the ends of the conspiracy; the essential element of the crime is the agreement to join in an illegal enterprise. *United States v. Marable,* 578 F.2d 151, 153 (5th Cir. 1978). It has been held that one who *sells* lactose representing it to be heroin cannot be convicted of participating in a drug conspiracy because he probably intended only to sell a counterfeit substance. *United States v. Murray,* 527 F.2d 401 (5th Cir. 1976). We do not think the same logic applies to someone like Kennington who *buys* what is represented to him to be heroin and pays ten or twelve thousand dollars for six ounces of it. The inference is inescapable that Kennington believed he was buying heroin and buying enough of it to support the inference that he intended to distribute it, *see United States v. Vomero,* 567 F.2d 1315 (5th Cir. 1978); *United States v. Johnson,* 469 F.2d 973, 977 (5th Cir. 1972), in furtherance of the conspiracy. Therefore, his conviction is affirmed.

### D. *Augustus Charles Bobo*

At the trial, Grace testified that in late July 1976, he had a conversation with Rowan about an informer problem in the organization. According to Grace, in the course of that conversation Rowan said that Bobo had been arrested in DeFuniak Springs, Florida, on a drug charge and that the search warrant presented by the arresting officers had stated that they had been told that Bobo was carrying drugs by an informant who had given reliable information in the past. Record, vol. 4, at 229–30. Bobo objected at trial and repeats his objection now that this statement was inadmissible hearsay and substantially prejudicial to his case. We find that the statement was not hearsay and was properly admitted.

Hearsay is defined as an out-of-court declaration "offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). The only purpose for which Rowan's statement was valuable as evidence was for the fact that it was said, not for the truth of its content. Whether Bobo had actually been arrested and what the search warrant might actually have said were irrelevant to the prosecution of this case. The importance of the statement was that it revealed Rowan's state of mind; it indicated that he was concerned about in-

---

**21.** The Government asked to dismiss the counts because Grace, who had been qualified as an expert on heroin, had not used or otherwise tested the substances involved, nor had anyone else tested them. Record, vol. 4, at 724.

**22.** As to the third incident, the Government was not restricted to proving the overt acts alleged in the indictment. *United States v. Johnson,* 575 F.2d 1347, 1357 (5th Cir. 1978).

formers. This tended to prove the existence of the conspiracy in that it evidenced a desire for secrecy and a concern that his activities might be reported to the police. "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Advisory Committee Note to Rule 801(c), 28 U.S.C.A. Rules of Evidence at 528 (1975). Since the truth value of the statement was irrelevant, it was not offered to prove the truth of the matter asserted and therefore was not hearsay. *See United States v. Carter,* 491 F.2d 625, 628 (5th Cir. 1974).

 Bobo also argues that the statement should have been excluded under Fed. R.Evid. 404(b) because it indicated that he had been involved in an offense extrinsic to those charged in the indictment against him. Since this case was argued, we have examined in detail the proper mode of analysis for the admission of extrinsic offense evidence. As we explained in *United States v. Beechum,* 582 F.2d 898 (5th Cir. 1978) (en banc), if such evidence is relevant to an issue other than the defendant's propensity to commit the crime for which he is charged, it may be excluded only by application of Fed.R.Evid. 403. *Id.* at 911. The relevancy of this evidence has already been shown.[23] In addition to its tendency to prove the existence of the conspiracy, the statement showed that Rowan trusted Grace enough to discuss an informant problem with him and thus bolstered substantially the weight of Grace's testimony. Since the evidence was relevant to issues other than Bobo's character, it could be excluded only if the judge chose to exercise his discretion under rule 403. We find no abuse in his decision not to do so. The incremental probity of the evidence was substantial. The extrinsic offense was not of a heinous nature likely to incite the jury to irrational behavior. Nor were any of the other criteria of rule 403 implicated. The statement was therefore admissible. Since we have already rejected the other claims of error in which Bobo joins, we affirm his conviction.

### III. CONCLUSION

We have dealt with all of the claims of error raised by appellants and find none of them to be grounds for reversal. The convictions of all appellants are AFFIRMED.

---

**23.** Unlike *Beechum,* the relevancy of this evidence in this case does not depend on whether Bobo actually committed the extrinsic offense. As we said in *Beechum,* "relevancy . . . is determined by the inquiry or issue to which the extrinsic offense is addressed." 582 F.2d at 911. Here, the issues are the existence of the conspiracy and the weight to be given the witness's testimony. The relevance of the statement derives wholly from its content and the fact that Rowan said it. The truth or falsity of the statement—whether or not Bobo was actually arrested—is irrelevant. Hence, no issue under Fed.R.Evid. 104(b) is presented. *See id.* at 912.