Daniel Perez, Jr., Houston, Tex. (Court-appointed), for Cuello.

Javier L. Correa, Houston, Tex. (Court-appointed), for Doe and Carvajal.

James R. Gough, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Luis A. CUELLO, Alvaro Bastides-Benitez, John Doe, a/k/a Hugo Hurtado, and Alvaro Carvajal, Defendants-Appellants.

No. 78–5314.

United States Court of Appeals,
Fifth Circuit.

July 25, 1979.

Before JONES, CLARK and GEE, Circuit Judges.

GEE, Circuit Judge:

Luis Cuello, Alvaro Bastides-Benitez, Alvaro Carvajal, John Doe, also known as Hugo Hurtado, and Linda Collazo, also known as Linda Lozado, were jointly indicted on one count of conspiracy to import cocaine. The district court granted the government's motion for severance as to Linda Collazo, and the remaining four defendants were tried together and convicted. Cuello, Carvajal, and Hurtado appeal raising various grounds of error, all relating to the admissibility and sufficiency of evidence.[1] Because we find the admissible evi-

---

1. Alvaro Bastides-Benitez also appealed, but his appeal was subsequently dismissed on mo-

tion of the government because Bastides escaped from custody.

dence insufficient to support the jury verdict of conspiracy to import cocaine, we reverse.

Jennie Valdes, an alleged coconspirator, testified at trial under a grant of immunity. Her testimony, somewhat difficult to recount both because of her language difficulties and because of internal inconsistencies, is substantially as follows. In September 1977, Collazo offered Valdes $500 per trip to take money to Colombia for the purchase of "merchandise," by which Collazo meant cocaine. Valdes refused. Subsequently, Collazo and her son flew to Cali, Colombia, followed shortly by her husband, Luis Cuello. Valdes' testimony raised the inference that Collazo had travelled to Colombia to arrange for the purchase of cocaine, but Valdes also testified that Collazo had gone to see about her rent property there. With regard to Cuello's trip to Colombia, Valdes testified both that Cuello had followed in response to a call from Collazo that she was sick and her baggage had been lost and that he had gone because Collazo wanted to introduce him to Alvaro Bastides and her other connections in Colombia. After Collazo's return from Colombia, she told Valdes that cocaine was arriving in New York aboard the CIUDAD DE BARRANQUILLA, that she was supposed to receive four kilograms of pure cocaine and four kilograms of cut cocaine, that Alvaro Bastides and Alvaro Carvajal would each receive like amounts, and that each of the three would receive a coded letter explaining the distribution of the merchandise. Valdes testified that Collazo did in fact receive such a letter from Colombia. Collazo subsequently learned that the ship would dock in Houston rather than in New York, and, because she was pregnant, she asked Valdes to accompany her to Houston when the ship arrived. Valdes initially refused but later agreed, testifying that she thought that the purpose of the trip to Houston was to pick up money that would be sent to Collazo by her delinquent tenants via sailors on the CIUDAD DE BARRANQUILLA.

On November 15, Cuello packed his bags and left after an argument with Collazo. He called her later that day from Houston, and Collazo told him that he was going to "mess things up" because his initials were not in the letter, only hers and Carvajal's and Bastides'. Carvajal also called Callazo on the 15th and told her that the ship had arrived. Collazo then withdrew $7,000 from the bank for the trip. On November 16, Collazo, Valdes, and Bastides flew to Houston, where they were met by Cuello and Carvajal. The five people stayed at Carvajal's apartment, along with Hugo Hurtado. Carvajal and Bastides made one trip to the docks on the 16th but returned, saying that they could not find the sailors. The following day Collazo and Cuello argued again about who would receive the merchandise on the ship; Collazo repeated that her initials were on the letter, not his. Afterward Bastides told Cuello that he would share his merchandise with Cuello. Then Carvajal and Bastides drove down to the docks again, and upon their return Carvajal said that the merchandise had been stolen. Meanwhile, Hurtado had warned Valdes that the merchandise should not be brought to the apartment because he had seen police tailing Carvajal and Bastides.

Late that night Collazo asked Valdes to stay until Sunday to help her and Bastides carry the cocaine back to New York.[2] Valdes refused because she had planned to stay only two days. After an argument with Collazo, Valdes packed her bag and left, intending to hail a taxi for the airport. Carvajal, Bastides, and Cuello, fearing for her safety, followed her outside and offered to drive her to the airport. After putting her bag in the trunk, they persuaded her to remain. Then Carvajal and Cuello left on an errand and were stopped by DEA agents shortly thereafter. While the agents were searching the apartment, Valdes observed Collazo eat a copy of the coded letter, and she saw Bastides discard a copy in the trash.

**2.** Although it is not significant for our purposes, we note that Collazo's request seems anomalous in light of Carvajal's statements that the merchandise was stolen.

The testimony of government agents substantially corroborated the testimony of Valdes in its objective aspects. In September 1977, Cuello, Collazo, and Bastides were placed under DEA surveillance in connection with the investigation of a suspected conspiracy to import cocaine aboard the Colombian merchant vessel CIUDAD DE BARRANQUILLA. On September 21, 1977, Cuello and Collazo arrived in New York from Cali, Colombia, and on November 13, Alvaro Bastides arrived in New Jersey from Cali, where he has three children and a small coffee farm. On November 15, 1977, Cuello travelled from New York to Houston, using an alias. The following day, Collazo, Bastides and Valdes flew to Houston, where they were met by Cuello and Carvajal. The five people were followed to Carvajal's apartment. Carvajal and Bastides drove to the pier area once on the 16th and once on the 17th, but on both occasions they were lost by surveillance and were never observed entering the docks. Hurtado was seen outside the apartment on at least two occasions, walking about the parking lot. Late on the night of the 17th, Carvajal, Cuello and Valdes were observed putting a bag in the trunk. Later, early on the morning of the 18th, Carvajal and Cuello left in the car, at which point the agents stopped them, suspecting that the cocaine had been retrieved from the ship and was now being moved. An extensive search of Carvajal's car and apartment did not turn up any cocaine or narcotic paraphernalia of any kind. The agents did, however, find an anonymous letter written in Spanish hidden under the wall-to-wall carpet of the apartment's upstairs bedroom. The letter direct-

ed that envelopes marked L–L–L belonged to "Linda," that envelopes marked A–C belonged to Alvaro Carvajal, and that envelopes marked A–B belonged to "A–B." The letter also noted the quantity of money that would be in each envelope. An expert witness testified that the quantities represented grams rather than dollars. The CIUDAD DE BARRANQUILLA was searched while it was in port at Houston and again when it arrived in New Orleans. The first search was not fruitful, but the second search turned up a package containing 234 grams of lidocaine hydrochloride[3]; the package was marked "A–B."[4]

Appellants variously urge (1) that the trial court erred in admitting out-of-court statements made by Collazo to Valdes, contending that there was insufficient independent proof of the existence of the conspiracy and of the appellants' participation in it; (2) that the trial court erred in admitting the letter, contending both that it was hearsay and that it was the fruit of an illegal search; (3) that the trial court erred in admitting the package of lidocaine, contending that it was irrelevant, prejudicial and contained inadmissible hearsay; and (4) that the evidence is insufficient to support the verdict of conspiracy to import cocaine.

In this opinion we deal only with the admissibility of coconspirators' statements because we find that issue dispositive.[5] There were two kinds of coconspirators' statements admitted in this trial, out-of-court statements made by Collazo to Valdes, and statements contained in an anonymous letter presumably written by a coconspirator.[6] The test for the admissibili-

---

3. A government witness testified that lidocaine hydrochloride is a substance commonly used to dilute cocaine.

4. There was evidence tending to show that a crew member aboard the CIUDAD DE BARRANQUILLA had initials "A–B."

5. For purposes of this discussion and in view of our disposition of the case, we will presume without deciding that the letter was the fruit of a lawful search and that the lidocaine was properly admitted.

6. Unfortunately, the government does not address the challenge to the letter as inadmissible hearsay; therefore, we are presuming, on the basis of cases cited by the district judge in the record below, that the letter was admitted as a coconspirator's statement. In view of our decision *infra* that there was an insufficient predicate under *Oliva* to justify the admission of any coconspirator's statements, we need not decide whether the letter would be admissible as such a statement. *See United States v. Oliva*, 497 F.2d 130 (5th Cir. 1974). And in view of the government's silence on the issue, we need not consider whether the letter would otherwise be

ty of these statements against a particular defendant is "whether the government, by evidence independent of the hearsay declarations of a co-conspirator, has established a prima facie case of the existence of a conspiracy and of the defendant's participation therein, that is whether the other evidence *aliunde* the hearsay would be sufficient to support a finding by the jury that the defendant was himself a conspirator." *United States v. Oliva*, 497 F.2d 130, 132–33 (5th Cir. 1974).[7] Applying that strict test to the facts of this case, we conclude that the government did not satisfy its burden.

The government's case is almost totally dependent upon the testimony of Jennie Valdes, and Valdes' knowledge is almost totally limited to what Collazo chose to tell her. It is true that some of Valdes' testimony was based on personal knowledge or observation, and we shall include that testimony in our consideration to the extent that it was not colored by knowledge acquired from Collazo. Apart from coconspirators' statements related by Jennie Valdes and those written in the anonymous letter, the government's evidence that a conspiracy to import cocaine existed and that each appellant was a member of that conspiracy is scant. The evidence that can be considered against all the appellants can be summarized as follows:[8]

1. Collazo, Cuello and Bastides had recently returned from Colombia.

2. Collazo often received letters from Colombia.

3. Cuello travelled to Houston using an alias.

4. Collazo withdrew $7,000 for the trip to Houston.

5. Collazo, Bastides and Valdes flew to Houston and stayed at Carvajal's apartment, along with Hurtado and Cuello.

6. Carvajal and Bastides made two trips to the pier area looking for sailors during the time that the CIUDAD DE BARRANQUILLA, a Colombian vessel, was in port there.

7. A letter similar to one of the letters Collazo received from Colombia was found under the carpet in Carvajal's apartment.

8. During the police search, Bastides and Collazo disposed of letters similar to the letter found in Carvajal's apartment.

9. A package of lidocaine, a common adulterant for cocaine, was found aboard the CIUDAD DE BARRANQUILLA.

That evidence is manifestly insufficient to prove the existence of a conspiracy to import cocaine, and, *a fortiori*, insufficient to prove participation by any of the appellants in such a conspiracy. However, there was additional evidence that can be considered against each appellant. Jennie Valdes testified to certain statements made by each appellant that can be considered against that appellant only as an admission by him under Fed.R.Evid. 801(d)(2). Against Cuello we can consider that he and Collazo argued about who would receive the "merchandise" on the ship, that Collazo reminded him that her initials were in the letter, not his, and that Bastides thereafter offered to share his "merchandise" with Collazo. Against Carvajal we can consider that upon the return from a trip to the pier area he reported that someone had stolen the "merchandise." Against Hurtado we can consider that he told Valdes that police were following their movements and that the "merchandise" should not be brought back to the apartment.[9] Although this ad-

admissible to prove the truth of the matters asserted.

**7.** The test set forth in *United States v. James*, 590 F.2d 575 (5th Cir.), cert. denied, —— U.S. ——, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), is not applicable to this case because *James* is not retroactive. 590 F.2d at 583. The jury in this case was given the common *Apollo* instruction that it could not consider coconspirators' state-

ments unless it was first satisfied beyond a reasonable doubt that a conspiracy existed and that appellants were members.

**8.** Of course, we are considering the evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

**9.** Jennie Valdes testified in each instance that the "merchandise" was cocaine, but she ac-

ditional evidence against each appellant does bolster the government's case, it is nevertheless clear that the government's independent evidence does not establish beyond a reasonable doubt the existence of a conspiracy to import cocaine or the participation in such a conspiracy by any of the appellants. Admittedly, the independent evidence provides fertile material for speculation, but it is not such that reasonable minds could conclude that it was inconsistent with every reasonable hypothesis of innocence. *United States v. Ragano*, 520 F.2d 1191, 1203 n.16 (5th Cir. 1975), *cert. denied*, 427 U.S. 905, 96 S.Ct. 3192, 49 L.Ed.2d 1199 (1976). Therefore, we conclude that the district judge erred in permitting the jury to consider the coconspirators' statements. Since those statements were crucial to the government's case, we reverse and render.[10] *United States v. Oliva*, 497 F.2d at 131.

REVERSED AND RENDERED.

quired that knowledge solely from statements made by Collazo, themselves inadmissible.

10. In view of our disposition of the case, we need not consider the other issues raised by appellants.